914 A.2d 1126

STATE of Maryland

v.

Lawrence Michael BORCHARDT.

No. 58 Sept. Term, 2005.

Court of Appeals of Maryland.

Jan. 12, 2007.

588

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, MD, for appellant.

Brian J. Murphy, Baltimore, MD (Julie S. Dietrich and Jeffrey B. O'Toole of O'Toole, Rothwell, Nassau & Steinbach, Washington, DC), all on brief, for appellee.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, Judge.

Lawrence Michael Borchardt was tried by a jury in the Circuit Court for Anne Arundel County in May 2000, and convicted of two counts of first degree murder and felony murder, and robbery with a deadly weapon. The jury sentenced Borchardt to death. On direct appeal, this Court affirmed the judgment and sentence. *Borchardt v. State*, 367 Md. 91, 786 A.2d 631 (2001), *cert. denied*, 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002) (*Borchardt I*). On March 24, 2003, Borchardt filed in the Circuit Court for Anne Arundel County a Petition for Postconviction Relief pursuant to Md. Code (2001, 2005 Cum. Supp.), § 7–102 of the Criminal Procedure Article. The Circuit Court ordered a new sentencing proceeding on the ground that Borchardt was denied effective assistance of defense counsel. We granted the State's application for leave to appeal to consider whether Borchardt was denied effective assistance of counsel. We shall reverse.

I.

Borchardt robbed and murdered Joseph and Bernice Ohler in their home in Baltimore County on November 26, 1998, Thanksgiving Day. In *Borchardt I*, 367 Md. 91, 786 A.2d 631, we set forth the facts underlying Borchardt's conviction and sentence as follows:

"The evidence presented at trial was largely uncontradicted and was more than adequate to show that, in the course of a robbery, Borchardt murdered Mr. and Ms. Ohler. Borchardt and his girlfriend, Jeanne Cascio, lived about a mile from the Ohlers, along with Borchardt's son and the son's girlfriend, Tammy Ent. In order to help support his

addiction to heroin, Borchardt, who was unemployed, would go door-to-door in the Golden Ring area of Baltimore County with Cascio, portraying her as cancer-afflicted and seeking donations to help pay for her treatment. On two previous occasions, Borchardt had been to the Ohler home, and Mr. Ohler had given him some money. On one occasion, Mr. Ohler drove Borchardt to a pharmacy, supposedly to pick up a prescription; in fact, Borchardt made a drug buy.

"Mr. Ohler's body was discovered in his backyard on Thanksgiving night, November 26, by a neighbor. When the police arrived, they found Ms. Ohler's body inside the house. Both had died of multiple stab wounds. Also found in the house was a promissory note for $60 from Borchardt to Mr. Ohler, a social security card and a State welfare card in the name of Cascio, the handle of a knife, and jewelry scattered on the floor. A block away, the police found Mr. Ohler's wallet, along with keys, business and credit cards, a bloody coat, and bloody leather gloves, the left one showing a slice on the ring finger. After visiting Borchardt's apartment and speaking with his son, the police obtained arrest warrants for Borchardt and Cascio and a search warrant for Borchardt's apartment. In executing the search warrant, the police seized several bloody rags.

"Borchardt and Cascio were arrested the next day, November 27. Borchardt had a cut on his left ring finger that corresponded to the slice found on the glove. He declined to talk with the police that day, claiming that he was suffering from drug withdrawal, but said that he would call them when he was ready to talk. He did so on December 9—twelve days later—at which time, after being advised of his rights, he gave a seven-page written statement confessing to the murders. In that statement, Borchardt acknowledged that he needed money to buy drugs, that he went to the Ohler home and was admitted inside by Ms. Ohler, that he asked for $40 and was refused, that he then asked Ms. Ohler for some water and, while she was in the kitchen getting it, he took out his folding knife and stabbed Mr.

Ohler five times, three times in the stomach and twice in the chest, that Ohler tried to escape but Borchardt knew he would not get far because of the way he was cut—his intestines were hanging out, that Borchardt then opened the desk in the hallway where he knew Mr. Ohler kept his wallet, that M s. Ohler ran in and said that she had called the police, whereupon he stabbed her three times, aiming for the heart, that Mr. Ohler managed to get out of the door, and that Borchardt then left with the wallet, took $11 from it, and discarded the cards and keys. Borchardt added that, though wearing his fur-lined leather gloves, he had cut his finger with the knife and that he discarded the gloves as well. In addition to the written statement, Borchardt told the detectives that 'he has a taste of blood now and he wants to keep killing whether it be inside or outside jail.'

"Borchardt's son confirmed that his father was unemployed and got money by asking for donations, using a collection box with Cascio's picture. He stated that, on Thanksgiving Day, Borchardt and Cascio left their home together, to 'hustle money for some more [drugs],' and that they returned about 20 minutes later. After Cascio bandaged Borchardt's finger, they left the apartment because, according to Borchardt, he 'had to stab a couple of people.' The son identified the knife handle found in the Ohler home as part of one of Borchardt's knives. Several of the Ohlers' neighbors identified Borchardt as having come to their homes soliciting money on behalf of a woman needing treatment for cancer. Finally, DNA testing disclosed that Joseph Ohler could not be excluded as the source of blood found on Borchardt's jacket and shoes, although Borchardt, Cascio, and Ms. Ohler *were* excluded as the source. Borchardt, on the other hand, could not be excluded as the source of blood on the gloves found a block from the Ohler home, whereas the Ohlers and Cascio were excluded as sources. One fingerprint found at the scene of the murders that was suitable for comparison was identified as that of Borchardt."

*Id.* at 99–101, 786 A.2d at 635–36. On May 10, 2000, a jury in the Circuit Court for Anne Arundel County found Borchardt guilty of two counts each of premeditated murder, first degree felony murder, and robbery with a deadly weapon.

Borchardt elected to be sentenced by a jury. The jury determined that death was the appropriate sentence for both murders. The jury found unanimously that Borchardt was a principal in the first degree in both of the murders, that Borchardt committed more than one offense of murder in the first degree arising out of the same incident and that he committed the murders while committing or attempting to commit a carjacking, armed carjacking, robbery, arson in the first degree, rape in the first degree, or sexual offense in the first degree. As to mitigating circumstances, one or more jurors found the following mitigating circumstances to exist: "dysfunctional family (emotional, physical, and sexual abuse)," "life without parole is severe enough," and "health problems." The Circuit Court imposed a twenty-year sentence for the robbery of Joseph Ohler, consecutive to the death sentence, and twenty years for the robbery of Bernice Ohler, concurrent with the consecutive term. On direct appeal, this Court affirmed. *Borchardt I,* 367 Md. 91, 786 A.2d 631.

Borchardt filed this Petition for Postconviction Relief requesting a new trial and sentencing, alleging, *inter alia,* ineffective assistance of defense counsel during the guilt/innocence phase and the sentencing phase, ineffective assistance of appellate counsel, that Maryland's system for imposing capital punishment violates the Eighth and Fourteenth Amendments to the United States Constitution and the Maryland Declaration of Rights, that Maryland's capital sentencing statute, particularly Md. Code (2002, 2005 Cum. Supp.), § 2–303(i) of the Criminal Law Article [1] requiring that the court or jury find that any aggravating circumstances outweigh any mitigating circumstances by a preponderance of the evidence is

---

1. Unless otherwise noted, all subsequent statutory references herein shall be to Md. Code (2002, 2005 Cum. Supp.) of the Criminal Law Article.

invalidated by the Supreme Court's decisions in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that Maryland's method of execution, lethal injection, violates the Eighth Amendment and the Maryland Declaration of Rights, and that the delegation of power to the Commissioner of Corrections to carry out the death sentence authorized by § 2–303(*l*) violates Articles 8 and 16 of the Maryland Declaration of Rights.

The Circuit Court for Anne Arundel County held a hearing on Borchardt's Petition for Postconviction Relief and granted Borchardt a new sentencing proceeding.

### A. Defense Counsel's Strategy

William Kanwisher, one of Borchardt's defense attorneys, testified at the postconviction proceeding that Borchardt's defense team tried the guilt/innocence phase with an eye toward building a case for mitigation at sentencing. Borchardt had two attorneys at trial—David Henninger and William Kanwisher. The record reflects that Henninger was lead counsel during the guilt/innocence phase, and Kanwisher was lead counsel at sentencing. Only Kanwisher testified at the postconviction proceeding.

The State had a strong case against Borchardt, which included physical evidence recovered at and near the crime scene implicating Borchardt and a detailed confession. Therefore, defense counsel explored the role of Jeanne Cascio in the Ohler murders. Because of statements that Cascio made to Patricia Garcia, a long-time friend of Cascio's, defense counsel pursued the strategy that Cascio was likely a principal in the first degree, at least as to the murder of Mrs. Ohler.

At sentencing, defense counsel argued "lingering doubt"[2] to the jury in an effort to undermine the State's case for princi-

---

**2.** Lingering doubt, or residual doubt, has been described by the United States Supreme Court as "a lingering uncertainty about facts, a state of mind that exists somewhere between beyond a reasonable doubt and absolute certainty." *Franklin v. Lynaugh*, 487 U.S. 164, 188, 108 S.Ct.

palship and to highlight Cascio's role in the murders.[3] In addition, defense counsel presented testimony of witnesses to provide the jury with a basis for finding both statutory and non-statutory mitigators. The defense presented evidence of Borchardt's severe health problems, including organic brain impairment, and the depraved physical, psychological, and sexual abuse to which his stepfather subjected him, and his mother tacitly observed.

## B. Guilt/Innocence Phase

Part of defense counsel's strategy was to convince the jury that Borchardt's girlfriend, Jeanne Cascio, was the violent one and that she was the principal in the first degree as to the murder of Mrs. Ohler.[4] To support this argument, the defense called as a witness Patricia Garcia, a friend of Cascio's, with the intent to present evidence that Garcia stated that Cascio used a knife to stab Mrs. Ohler.

Dr. Carlos Zigel, an internist in private practice, testified at trial regarding Borchardt's numerous medical problems. Dr.

---

2320, 2335, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring) (internal quotations omitted). *See also State v. Hartman,* 42 S.W.3d 44, 57 (Tenn.2001) (explaining that residual doubt is established by proof that casts doubt on the defendant's guilt and is not limited to proof that mitigates the defendant's culpability for the crime). Although the United States Supreme Court has concluded that, because lingering doubt does not pertain to a capital defendant's character, record, or a circumstance of the offense, a capital defendant has no constitutional right to have such doubts considered as a mitigating factor, *Franklin,* 487 U.S. at 174, 108 S.Ct. at 2327, the Court has noted that defense counsel may argue lingering doubt to the sentencing jury. *See id.* at 174–75, 108 S.Ct. at 2327.

 In the instant case, Kanwisher raised and argued, without objection, lingering doubt as a mitigating factor to the sentencing jury.

3. One of the death penalty aggravating factors alleged by the State was that Borchardt committed more than one offense of murder in the first degree arising out of the same incident. *See* Md. Code (2002, 2005 Cum. Supp.), § 2–303(g)(ix) of the Criminal Law Article.

4. Jeannie Cascio was indicted for the Ohler murders and tried separately. She was convicted and sentenced to life without parole. The State did not consider her a principal in the first degree and therefore did not file a death penalty notice.

Zigel, though he did not meet with Borchardt personally, reviewed Borchardt's medical records from 1990 to 1997, and testified that Borchardt was afflicted with hepatitis C, coronary artery disease, and insulin dependent diabetes. Dr. Zigel testified that Borchardt has experienced chronic pain in his neck for approximately ten years from an accident that resulted in a herniated disk. At sentencing, defense counsel called Dr. Zigel to explain Borchardt's medical problems. In his testimony, Dr. Zigel included descriptions of each of Borchardt's ailments and explained that Borchardt's conditions were chronic.

To establish that Borchardt was suffering the effects of withdrawal from heroin at the time of the murders, and to explain how his ability to give a voluntary confession was affected, defense counsel called Dr. Jeffrey Janofsky, a psychiatrist, and member of the faculty at The Johns Hopkins University and University of Maryland medical schools, who reviewed Borchardt's medical records and conducted two clinical interviews with him. Based on his review of Borchardt's medical records, a stipulation at trial that Borchardt used 0.1 grams of heroin per day, and the clinical interviews he conducted, Dr. Janofsky concluded that Borchardt suffered from heroin dependency at the time of the murders.

## C. Sentencing Phase

Dr. Thomas Hyde, Ph.D., M.D., board certified neurologist, and an expert witness in other capital cases in Maryland and throughout the country, testified regarding Borchardt's neurological problems. He explained that he conducted a comprehensive neurological examination of Borchardt and determined that Borchardt had organic brain impairment.

Defense counsel called Bill Borchardt, Borchardt's brother, and Lawrence Michael Borchardt, Jr., Borchardt's son, to present social history testimony. From the testimony of appellee's son, the jury could have reasonably inferred that appellee had family members who loved him and would be impacted by his death. Borchardt's son testified that he would "be there" for his father if his father were sentenced to

life without parole instead of death, that he loved his father, and that he did not know if he would be able to "handle it emotionally" if his father were sentenced to die.

Bill Borchardt, a licensed social worker and certified chemical dependency counselor, painted a grim picture of appellee's upbringing and early family life. He testified that their parents divorced when the children were five or six. Bill explained that his mother took the children without any notice to an unfamiliar apartment and told them that the man living there was going to be their new father. Upon meeting the brothers for the first time, the man beat appellee with a metal curtain rod because of an incident that occurred between the brothers earlier in the day. Bill testified that their stepfather would beat them with "anything that came within his reach," including a switch, a belt, a dog leash, a curtain rod, and a cord from a lamp. The brothers were sent to their room without being permitted to eat for days. As a punishment for stealing an apple from a street vendor when they were hungry, the stepfather forced appellee to go outside the house wearing a dress, in front of Bill and three female neighbors. Before he was forced to wear the dress, Lawrence informed Bill that their stepfather had pulled his pants down and rubbed his genitalia on his buttocks. Bill testified that a few years after that incident, his brother was sent home from school for the "inappropriate touching" of a female. As a result of a court delinquency finding for this sexual offense as a juvenile, Bill testified that Lawrence was committed to Spring Grove hospital.

In addition to the constant abuse, Bill explained to the jury that, due to the actions of the stepfather, the family life was very unstable. The stepfather forced the family to move frequently. The brothers and their mother were not permitted by their stepfather to see other family members, with the exception of their grandmother, whom he thought she was going to leave them money.

Defense counsel explored the reasons why Bill's life turned out so differently from his brother's life, explaining that he

had several role models who had made a difference in his life, and that Lawrence was exposed to individuals who did not provide as positive an influence. Bill testified that he spent time away from the family, serving as a marine in Vietnam, and sought help for his own alcohol addiction through Alcoholics Anonymous. He affirmed his support for his brother. The State did not cross-examine Bill Borchardt, and at the postconviction hearing, Kanwisher testified that Bill was emotional during his testimony.

In closing argument at sentencing, to counter a defense argument for mitigation, the State emphasized that Borchardt would constitute a future danger, even while incarcerated, and that Borchardt could appreciate the criminality of his conduct when he murdered the Ohlers. The prosecution reviewed Borchardt's extensive criminal record set out in the presentence investigation report, and the threats Borchardt had made against several people, including Officer Bruce Kurtz and his family. During appellee's incarceration, prior to trial, an incident report revealed that he had threatened to cut the eyes and heart out of a nurse who was trying to administer insulin to him. Borchardt told Baltimore County detectives who were interviewing him concerning the Ohler murders that he had a "taste for blood" and that he would continue to kill, whether or not he was incarcerated. Finally, the State reminded the jury that Borchardt had threatened his son with physical harm if his son did not sell furniture to pay bills. The State contended that the Ohler murders were goal-oriented crimes committed by a drug addict to obtain money for drugs.

In the defense's closing argument to the sentencing jury, Kanwisher emphasized "lingering doubt," [5] Borchardt's social

---

5. Kanwisher explained lingering doubt to the sentencing jury in his opening statement as follows:

"Lingering doubt means that at this stage you all have found him guilty of first degree murder, and felony murder and robbery with a deadly weapon. My question to you is are you sure? My question to you is there some ticklish place in your stomach, is there some small piece of you that says I'm not really quite sure exactly what happened

history and health problems, including organic brain impairment, and argued that the jury could find two statutory mitigators in addition to non-statutory mitigators. Kanwisher argued that Borchardt had organic brain impairment, untreated, at the time of the murders, and was experiencing withdrawal from heroin dependency, either of which was sufficient to find that Borchardt could not appreciate the criminality of his actions.[6]

Kanwisher maintained that a forty-eight year old man with the chronic, severe health difficulties of Borchardt would not be a danger in prison, and that he would more likely become the victim of other inmates. Kanwisher noted that appellee tried frequently to protect his girlfriend, Jeanne Cascio, and claimed that Cascio's role in the murders had never been

---

in that house; I'm not quite sure exactly who did what and why in that house? If you find that place, if you feel that, fine. If you understand that, then you have found lingering doubt. And if you find lingering doubt, ladies and gentlemen, I submit to you in the strongest possible terms, I can't say it any stronger, that's enough. That's enough to give him life without parole and send him to that fetid, stinking cell. Because nobody wants to make a mistake. Nobody wants to make this kind of mistake."

He reiterated the case for lingering doubt during the closing as follows: "If at some point, some stage, you have reached some state of uncertainty as to what went on in that house on that day, who participated, and how and why, that, ladies and gentlemen, is a lingering doubt. And I suggest to you that the evidence in this case supports finding of a mitigator called lingering doubt. Mr. Borchardt's statement that came into evidence at the guilt/innocence was replete with lies. Detective West told you that from the witness stand. Every time he said Jeanne was not involved, it was a lie. And, as I told you in opening statement, there was nothing more important to Mr. Borchardt than protecting Jeanne Cascio. He loved her more than he loved himself, and he would do anything to protect her. And the evidence is clear that she was participating. Yet he said over and over, consistently, she was not involved."

6. Kanwisher's discussion of Borchardt's organic brain impairment and withdrawal at the time of the murders was an attempt to generate a statutory mitigator. *See* Md. Code (2002, 2005 Cum. Supp.), § 2–303(h)(2)(iv) of the Criminal Law Article ("the murder was committed while the capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired due to emotional disturbance, mental disorder, or mental incapacity").

explained fully, which should create lingering doubt. The testimony of Bill Borchardt revealed to the jury the extent to which appellee was "humiliated, physically abused, sexually abused, [and] psychologically abused," and because of this, Kanwisher argued, appellee's capacity to act a responsible adult was impacted significantly. In conclusion, Kanwisher emphasized Borchardt's physical, medical, social, and psychological problems as a basis for the jury to impose a sentence of life without parole as an act of mercy. The jury sentenced Borchardt to death, and the trial judge imposed sentences for the two counts of robbery with a deadly weapon.

After this Court affirmed Borchardt's convictions on direct appeal, Borchardt filed his Petition for Postconviction Relief. The Circuit Court for Anne Arundel County granted Borchardt relief, ordering a new sentencing proceeding. The postconviction court concluded as follows:

"For the reasons described above, Petitioner is granted postconviction relief based on the ineffective assistance of counsel due to trial court's decisions at sentencing regarding Pam Taylor, Dr. Lawrence Donner, Dr. Thomas Hyde, the order of his witnesses, and the lack of additional presentation of evidence regarding the unlikelihood for future dangerousness. Petitioner is also granted postconviction relief based on ineffective assistance of counsel resulting from the cumulative effect of these decisions."

We granted the State's application for leave to appeal to consider whether the Circuit Court erred in holding that Borchardt was denied effective assistance of counsel in the sentencing proceeding. We have rephrased the question presented as follows: [7]

---

7. The State presented the following question in its Application for Leave to Appeal:

"Did the Circuit Court for Anne Arundel County err in finding that sentencing counsel was constitutionally ineffective in failing to call Pam Taylor as a mitigation specialist and/or in failing to ask her to prepare a social history report; in failing to call Dr. Lawrence Donner as an expert witness or failing to either videotape his testimony or call another expert in neuropsychology; in failing to present

I. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in failing to call Pamela Taylor, as a mitigation specialist or in failing to ask her to prepare a social history report?

II. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in failing to call Dr. Lawrence Donner as an expert witness or failing to either videotape his testimony or call another expert in neuropsychology?

III. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in failing to present evidence relative to future dangerousness?

IV. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in agreeing to limit the testimony of Dr. Thomas Hyde?

V. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective because there was cumulative prejudice as a result of counsel's representation?

## II.

 The principles applicable to a review of a claim of ineffective assistance of counsel are well-established. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Walker v. State,* 391 Md. 233, 892 A.2d 547 (2006); *Mosley v. State,* 378 Md. 548, 836 A.2d 678 (2003). A defendant claiming ineffective assistance of counsel must show (1) that counsel's performance was deficient, *i.e.,* that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different, *i.e.,* a probability sufficient to undermine confidence in the outcome. *See Strickland,* 466 U.S. at 687–88, 694, 104 S.Ct. at 2064, 2068; *Walker,* 391 Md. at 245–46, 892 A.2d at 554. In other words, in order to satisfy

evidence relative to future dangerousness; in agreeing to limit the testimony of Dr. Thomas Hyde; and in finding that there was cumulative prejudice as a result of counsel's representation?"

the prejudice prong of *Strickland*, a defendant must show that, but for counsel's errors, there is a "substantial possibility" that the result of the proceedings would have been different. *Bowers v. State*, 320 Md. 416, 426–27, 578 A.2d 734, 739 (1990). The deficient performance inquiry includes a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) (internal citations omitted). In reviewing an ineffective assistance of counsel claim, scrutiny of counsel's performance must be highly deferential. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Walker*, 391 Md. at 246, 892 A.2d at 554; *Oken v. State*, 343 Md. 256, 283, 681 A.2d 30, 43 (1996) (*Oken II*). We noted in *Oken II* that courts should not second-guess decisions of counsel, stating as follows:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.* Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Oken II*, 343 Md. at 283–84, 681 A.2d at 43 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065) (emphasis added) (internal quotations omitted).

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead emphasized that '[t]he proper measure of attorney performance

remains simply reasonableness under prevailing professional norms.' " *Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2535 (internal citations omitted). The Supreme Court, in *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), made clear that in judging the defense investigation, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.' " *Id.* at 381, 125 S.Ct. at 2462 (internal citations omitted).

Even though the standard of reasonableness spawns few hard-edged rules, nonetheless, before counsel makes a strategic decision, that decision must be founded upon adequate investigation and preparation. When we review and evaluate defense counsel's performance, we assess the reasonableness of counsel's decisions and the reasonableness of the investigation underlying each decision. Before deciding to act, or not to act, counsel must make a rational and informed decision on strategy and tactics based upon adequate investigation and preparation. The *Strickland* Court, in discussing strategic choices, pointed out as follows:

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Strickland,* 466 U.S. at 690–691, 104 S.Ct. at 2066.

██ Capital defense counsel has an affirmative duty to pursue mitigating evidence and to conduct an appropriate investigation into potential mitigating factors. Accordingly, "our principal concern in deciding whether [counsel] exercised

reasonable professional judgment is ... whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable.*" *Wiggins,* 539 U.S. at 522–23, 123 S.Ct. at 2536 (emphasis in original) (internal quotations and citations omitted). "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" *Id.* at 523, 123 S.Ct. at 2536 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065). More recent American Bar Association Guidelines that the United States Supreme Court has recognized as reflecting prevailing professional norms emphasize that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins,* 539 U.S. at 524, 123 S.Ct. at 2537 (emphasis in original) (quoting American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1(C), at 93 (1989)).

In *Wiggins,* the Supreme Court considered defense counsel's responsibility to investigate and present mitigating evidence at a capital sentencing proceeding. The Court reversed the United States Court of Appeals for the Fourth Circuit, which had concluded that this Court in *Wiggins v. State,* 352 Md. 580, 724 A.2d 1 (1999), did not unreasonably apply clearly established law in rejecting Wiggins' Sixth Amendment claim.

In *Wiggins,* defense counsel's strategy in the sentencing proceeding was to convince the jury that Wiggins was not a principal in the first degree in the killing of Ms. Florence Lacs, a predicate for the death penalty, or to raise a reasonable doubt in that regard. Having decided primarily to contest principalship at sentencing, Wiggins' attorneys did not introduce any evidence of Wiggins' life history or family background during the sentencing proceeding. Before making this decision, counsel obtained from a psychologist a report that revealed the defendant's IQ, his difficulty in coping with difficult situations, and that he exhibited features of a personality disorder. *Wiggins,* 539 U.S. at 523, 123 S.Ct. at 2536.

Defense counsel also obtained a copy of the defendant's presentence investigation report, which included a single page describing the defendant's personal history and containing information of Wiggins's "misery as a youth" and the time he spent in foster care. *Id.* Defense counsel also had a copy of Baltimore City Department of Social Services records documenting Wiggins's placements by that organization. *Id.*

The Supreme Court determined that the decision by Wiggins' counsel not to expand their investigation beyond those records failed to meet either the professional standards prevailing in Maryland at that time or the standards for capital defense work set out by the American Bar Association. *Id.* at 524–25, 123 S.Ct. at 2536–37. The Court pointed out that it was not second-guessing defense counsel's decision to pursue one strategy over another, noting as follows:

> "Our principal concern in deciding whether [defense counsel] exercised 'reasonable professional judgment' is not whether counsel should have presented a mitigation case. *Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable.*"

*Id.* at 522–23, 123 S.Ct. at 2536 (internal citations omitted) (emphasis added). The Supreme Court concluded that counsel, who failed to investigate information likely relevant to Wiggins's mitigation case in a Department of Social Services report, "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524, 123 S.Ct. at 2537. As a result, defense counsel "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527–28, 123 S.Ct. at 2538. The Court stated as follows:

> "In finding that [defense counsel's] investigation did not meet *Strickland's* performance standards, we emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how

unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland.* We base our conclusion on the much more limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.' A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'

"Counsel's investigation into Wiggins's background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records—evidence that would have led a reasonably competent attorney to investigate further."

*Id.* at 533–34, 123 S.Ct. at 2541–42 (internal citations omitted).

### III.

The State's argument as to all of Borchardt's claims of error is that Borchardt was well-represented by experienced and able defense counsel. At the postconviction proceeding, the State presented evidence as to defense counsel's experience. William Kanwisher, counsel at the sentencing proceeding, had been involved in five prior capital cases that had gone to trial. He had worked as a Public Defender investigator on several capital cases before he became a lawyer, and as an attorney in that office, he worked initially with the mental health unit of that office. He was very experienced in mental health issues in capital cases and was familiar with the ABA guidelines in capital cases as to mitigation specialists. He testified in part as follows:

"My main duties as lawyer responsible for sentencing was to investigate as best I could mitigation, mitigation in the

broadest possible sense, including mental health issues, taking in and hiring a social worker to do a social history, to perform interviews, collect documents, and come up with a social history.

"It was also my job to, as best as possible, try and make sure that the trial of the guilt-innocence portion of the case would not detract from the sentencing and also that it would, in some degree, highlight issues that we would like to accentuate within the case. My responsibility as well was to—I probably did more client contact than my co-counsel. I personally, because I have the background in actually interviewing and doing mitigation development, interviewed some witnesses on my own. I tried to develop a relationship with Mr. Borchardt's brother, who was in many ways the most interested relative of his family."

David Henninger, Kanwisher's co-counsel, was the lead counsel during the guilt/innocence phase. He did not testify at the postconviction proceeding, but the State entered into evidence his affidavit, which stated as follows:

"I, David P. Henninger, do hereby affirm under the penalties of perjury that the following facts are true.

"I am a practicing attorney admitted to the practice of law in the State of Maryland. I was an Assistant State's Attorney for approximately eight years beginning in 1976. Since leaving the State's Attorney Office I have been in private practice. My practice is almost exclusively criminal defense.

"I first defended a death penalty case in 1983. I have been trial counsel in approximately twelve death qualified murder cases in Maryland. I have also been the primary defense counsel in three death qualified Federal cases.

"I have tried over one hundred criminal jury trials and significantly more bench trials in my career."

The State's main argument is that one of Kanwisher's overriding concerns in the sentencing proceeding was to avoid opening the door to the problems regarding Borchardt's background, history of violence and future dangerousness. He

particularly wished to avoid providing the State an opportunity to conduct a mental health examination of Borchardt and to avoid the introduction into evidence of very damaging information contained within States Exhibit 6, 7, and 8. Kanwisher believed that the trial judge might have ruled that the documents were admissible because the trial court "wasn't very helpful to the defense in this situation." The State maintains that the postconviction court's ruling was second-guessing of defense counsel's strategy, lacking deference to counsel's decisions, and was simply "the distorting effects of hindsight," a review standard to be eschewed.

Borchardt argues that the postconviction court was not clearly erroneous in its factual findings, and that, throughout the preparation of the mitigation case, defense counsel neither made reasonable investigations nor reasonable decisions not to investigate. He maintains that during sentencing, defense counsel's presentation of evidence did not include essential mitigating content, and that the jury heard mostly harmful, unrebutted information about him. Borchardt argues that defense counsel's decisions not to call important witnesses, such as a mitigation specialist or a neuropsychologist, or agreeing to limit a witness's testimony were not made after a thorough investigation of the plausible, strategic options available, and thus were unreasonable. Borchardt argues, in sum, that the postconviction court was correct in finding that sentencing counsel's failure to present some form of mitigating evidence as to Borchardt's unlikelihood for future dangerousness was objectively unreasonable.

**A. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in failing to call Pamela Taylor, as a mitigation specialist or in failing to ask her to prepare a social history report?**

The Circuit Court held that Borchardt was denied effective assistance of counsel, stating as follows:

"Counsel's failure to investigate or substantiate State's Exhibits 6, 7, and 8, his speculative belief that Judge Howe [the trial judge] would have allowed the State to improperly cross-examine Pam Taylor on future dangerousness, his

failure to ask Pam Taylor to prepare a social history report despite the fact that Ms. Taylor had enough information to do so and counsel had the funds to compensate her for it, and his failure to admit a social history report into evidence and/or call her as a witness were objectively unreasonable decisions, made after a limited investigation of the facts, which prejudiced Petitioner at sentencing."

The postconviction court described State's Exhibit No. 6 as follows:

"First, State's Exhibit 6 is entitled 'Report of Investigation' and dated December 21, 1998. The Report contains statements Petitioner made to Detective West indicating that Petitioner alone was responsible for killing the Ohlers and that Jeanne Cascio should be released. He further stated that he 'has the taste of blood in his mouth and wants to keep killing.['] It did not matter whether it be inside the jails or on the outside as a free man. He said that for the past several weeks, he has been waiting to hurt someone. He had a friend of his, Paul Winebrener, sharpen his knife. He described it as being sharp as a razor. He further stated that he had been waiting to use the knife and that it performed well. 'The knife went through their [the Ohlers'] clothing and bodies like butter.'"

The court described State's Exhibit No. 7 as follows:

"Next, State's Exhibit 7 is entitled Report of Investigation and is dated December 3, 1998. In the Report, Petitioner asked Detective Jay Landsman whether Petitioner's son had yet recanted his previous statement regarding Jeanne Cascio's whereabouts during the incident. Detective Landsman replied that he had not confirmed the particulars about Petitioner's son's statement but that he had, as of yet, been unable to clear Jeanne Cascio. In response, Petitioner replied 'he was going to have one of his Pagan friends kill his son.' He further stated he had 'nothing to lose because he wants to get the death penalty.'"

The court described State's Exhibit No. 8 as follows:

"Third, State's Exhibit 8 contains another statement Petitioner made to Detective Jay Landsman on December 8,

1998 in which he implicated himself in the murder of two people whose bodies were allegedly buried behind a house in Kingsville, as the result of a contract murder Petitioner participated in sometime around October of 1987. Petitioner also told Detective Landsman about a murder he claimed to have committed on Falls Road in Baltimore City somewhere between 1974 and 1976. The State established that Mr. Kanwisher had knowledge of the contents of each of these three exhibits at the time of sentencing but that the information was never presented to the jury. Finally, the State elicited from Mr. Kanwisher that Petitioner had also made statements to police officers that he belonged to a motorcycle group called the Pagans. Mr. Kanwisher also had knowledge of this fact at the time of sentencing and the information never came before the jury."

Pamela Taylor was a psychiatric social worker, hired in 2000 by Borchardt's defense counsel to prepare a social history of Borchardt. She conducted an investigation and provided counsel with a report summarizing her findings.[8] Kanwisher did

---

8. In a letter to Kanwisher, dated April 27, 2000, Taylor provided the following summary of her findings prior to trial:

"Upon your request, I have conducted a psychosocial investigation of the above client's background. Over the past months I have had the opportunity to conduct in-depth clinical interviews with the defendant and members of his family. In addition, I have reviewed the records provided by you.

"My investigation has revealed that Mr. Borchardt suffered a traumatic childhood which was marked by physical, sexual, and emotional abuse. Both biological parents were alcoholic and his formative years experienced as overwhelmingly harsh and chaotic. He did not have the benefit of basic emotional supports to buffer these adversities, and accordingly remained socially isolated and depressed from an early age.

"It is my professional opinion that these early formative experiences had a significant impact on how Mr. Borchardt came to experience the world, and on his later functioning. Internally, he carried much shame and anger about his life. He was distrustful of others and showed an inability to sustain meaningful relationships. As a primary coping strategy, he immersed himself from a young age in alcohol and drug abuse. It is clear that both his impaired personality organization and severe heroin addiction played significant roles in the offense that ultimately ensued.

not call Taylor as a witness at the sentencing proceeding. He testified at the hearing as to the reasons that he did not call her:

"[T]he reason we didn't call Pam Taylor was because we were concerned about opening up doors on cross-examination. There were, as we said, a number of different situations and problems regarding Mr. Borchardt. And doing sort of the cost benefit analysis of putting her on, what she could present, what we could present by potentially other sources, and the possible downside of cross-examination, we felt in that analysis that we wouldn't call her."

Kanwisher was concerned that Pamela Taylor's testimony would open the door on cross-examination to harmful information about Borchardt's background, his criminal history, and the statements he had made. He also believed that Bill Borchardt's testimony, a social worker and Borchardt's brother, essentially covered the same ground as Taylor's, without the risk connected to Taylor. Bill Borchardt's testimony was described by Kanwisher as compelling and emotional.[9]

Before this Court, the State argues that defense counsel made a strategic choice to present Lawrence Borchardt's social history through Bill Borchardt because Bill's testimony would be more effective than that of a mitigation specialist, who did not have first-hand knowledge of the abuse to which Lawrence was subjected. The State maintains that because Bill Borchardt was such an effective mitigation witness, the prosecution chose not to cross-examine him. Based on the opinions that the mitigation specialist would have offered at

---

"Thank you for the opportunity to work on this case. Please do not hesitate to contact me should there be anything further needed."

**9.** Kanwisher testified at the postconviction hearing that he thought the benefits in calling Borchardt's brother were that "[h]e cried. He was very emotional. He pled for his brother's life." The State represented before the postconviction court that it chose not to cross-examine Bill Borchardt "because he was so compelling, that he sobbed through his testimony, that he begged for his brother's life, something Pam Taylor could not have done, that the State wanted to get him out of the courtroom as quickly as possible."

sentencing, the door would have been opened for the State to cross-examine her about damaging aspects of Borchardt's social history, including prior convictions, threats that he made, and other murders to which he had admitted to committing.

Borchardt argues that defense counsel's mitigation investigation was incomplete because defense counsel did not call the mitigation specialist as a witness or put her social history report before the jury, and notes that defense counsel did not ask her to complete a social history report for their review before deciding not to call her as a witness. With respect to defense counsel's concern that the mitigation specialist would have been subject to cross-examination regarding future dangerousness, appellee argues that it was objectively unreasonable for defense counsel not to investigate the accuracy or the admissibility of the additional evidence that might have been admitted on the issue, and points out that some evidence on future dangerousness was before the jury through the presentence investigation report and came in also during the guilt/innocence phase and the sentencing phase. Appellee provides additional mitigating evidence that he believes Taylor's social history report or testimony would have put before the jury, including specific examples of abuse and additional details of Borchardt's family history, and an explanation pertaining to the significant IQ difference between Lawrence and Bill. Appellee argues also that the mitigation specialist could have explained "the series of great misfortunes Appellee suffered and link them in a rational way to his current state of functioning," which appellee's brother did not do during his testimony.

■ We hold that the postconviction court erred in finding sentencing counsel ineffective by not calling Taylor as a witness. In this case, counsel conducted a thorough investigation, and based upon that information, made a strategic decision based upon the benefits and the risks in deciding not to call the witness. This case is not like *Wiggins,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, or *Williams v. Taylor,* 529

U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), cases relied upon by Borchardt and the postconviction court. As the Supreme Court has often stated, reviewing courts should be "highly deferential" to the tactical decisions of counsel. *See, Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. As reflected by testimony at sentencing, defense counsel were aware of several sources of mitigating evidence before deciding not to call the mitigation specialist, or requesting that she prepare a full social history report. The report and testimony of Dr. Hyde make it apparent that defense counsel knew of appellee's physical and medical problems, as well as his brain injuries and abnormalities. Bill Borchardt's testimony reflects that defense counsel had knowledge of appellee's family life, and the frequent obstacles appellee encountered throughout his life. Before deciding not to call her, Kanwisher had multiple conversations with Taylor about her findings, and asked her to prepare a summary of them. Before trial, Taylor provided Kanwisher with a summary of her findings. Based upon the information defense counsel had uncovered in their investigation, their knowledge of the contents of the mitigation specialist's prospective testimony, and their strategy intended to prevent any social history witness from facing cross-examination damaging to Borchardt's mitigation case, defense counsel's decision not to obtain a complete social history from the mitigation specialist, or call her to testify at sentencing was an exercise of reasonable professional judgment. *See Wiggins,* 539 U.S. at 528, 123 S.Ct. at 2539 (stating that "[a]s we established in *Strickland,* 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " (internal citations omitted)).

 In addition, the question of whether to call a witness is a question of trial strategy ordinarily entrusted to counsel; therefore, we afford defense counsel's decision not to call the mitigation specialist great deference. *See, e.g., Knight v. Spencer,* 447 F.3d 6, 16 (1st Cir.2006); *Sanders v. Trickey,* 875 F.2d 205, 212 (8th Cir.1989); *Trapnell v. United States,* 725 F.2d 149, 155–56 (2d Cir.1983); *United States ex rel. Walker v.*

*Henderson,* 492 F.2d 1311, 1314–15 (2d Cir.1974); *In re Davis,* 152 Wash.2d 647, 101 P.3d 1, 52 (2004). The decision not to call a witness, however, must be grounded in a strategy that advances the client's interests. *See Pavel v. Hollins,* 261 F.3d 210, 218–19 (2d Cir.2001). If an attorney decides not to call a witness without regard for the client's interests, that decision is not a strategic choice entitled to deference. *See id.* at 219. *See also Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066 (stating that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). The United States Court of Appeals for the Second Circuit explained the extreme hesitancy of appellate courts to second-guess strategic decisions of defense counsel as follows:

> "This special reluctance is, *inter alia,* prophylactic. Although it is clear *ex ante* that, in most cases, an attorney can provide constitutionally adequate assistance to his client by pursuing any number of trial strategies, strategic choices made by an attorney whose client ends up being convicted have a way of looking especially inadequate in the bright light of hindsight. But our focus in analyzing the performance prong of Sixth Amendment ineffective-assistance-of-counsel claims must be on the reasonableness of decisions when they were made, not on how reasonable those decisions seem in retrospect. Our articulated reluctance to hold that an attorney's strategic choices were constitutionally deficient helps to focus us on this imperative—it disciplines our analysis by serving as a useful counterbalance to the unconscious, inevitable impact of hindsight on our decision-making."

*Pavel,* 261 F.3d at 217 n. 9 (internal citations omitted).

At the postconviction hearing, Kanwisher testified that defense counsel were concerned about opening the door during cross-examination of the mitigation specialist, especially upon the issue of future dangerousness. He was particularly concerned about the information contained within State's Exhibits No. 6, 7, and 8, as well as his concern "about opening up doors on cross-examination."

Kanwisher called other mitigation witnesses, who would not be subject to cross-examination on the issue of future dangerousness, including Bill Borchardt, who provided social history testimony, and Dr. Hyde, who provided medical testimony explaining appellee's impaired intellectual capabilities.[10] In calling other mitigation witnesses besides Pamela Taylor, trial counsel made a strategic decision, which they thought to be in their client's best interests, which Kanwisher explained in his testimony at the postconviction proceeding.

In her social history report, Taylor concluded that appellee's upbringing and his below average intellectual capacity contributed to the difficulties he has had in functioning throughout his life. When counsel decided not to call Taylor as a witness at sentencing, on the basis of the summary of her findings Kanwisher had reviewed prior to trial, they knew that Taylor was prepared to opine that Borchardt's life and lack of intellectual capacity inhibited his development, and that Borchardt's abuse and heroin dependency contributed to the Ohler murders.[11] If trial counsel had called Taylor at sentenc-

---

**10.** The complete social history report prepared by Taylor for the postconviction proceeding contains evidence similar to the evidence admitted at the sentencing hearing through other witnesses and avoided the damaging cross-examination feared by defense counsel. The social history report is consistent with the information the mitigation specialist discussed in her letter summarizing her findings to trial counsel prior to sentencing, and not materially different from mitigating testimony the jury heard from Bill Borchardt. The evidence contained in the testimony and report of the mitigation specialist is cumulative of evidence trial counsel presented to the jury, and thus, we reject appellee's claim of ineffective assistance of counsel for trial counsel's failure to call the mitigation specialist to testify. *See Oken v. State*, 343 Md. 256, 287, 681 A.2d 30, 45 (1996) *(Oken II )* (concluding that "[w]e have made our own independent review of the record and find that the jury heard substantial evidence of substance abuse"); *Gilliam v. State*, 331 Md. 651, 679, 629 A.2d 685, 699 (1993) *(Gilliam II)*. *See also Hodges v. State*, 885 So.2d 338, 347 (Fla.2004) (holding that "[t]he presentation of changed opinions and additional mitigating evidence in the postconviction proceeding does not ... establish ineffective assistance of counsel").

**11.** The *curriculum vitae* of the mitigation specialist indicates that she "has extensive clinical experience and education in psychiatric social work with forensic specialty" and has testified and prepared written

ing, the State would have had the opportunity to cross-examine her on the foundation of her opinions, the sources of her research, and other factors possibly contributing to Borchardt's "life functioning" and his murder of the Ohlers. Considering trial counsel's concerns regarding cross-examination of the mitigation specialist in light of the mitigation case they did put on at trial, trial counsel made a reasonable strategic choice not to call the mitigation specialist at sentencing. Defense counsel's strategy and concerns were reasonable. Even though some of the harmful evidence came before the jury from other sources, it was not unreasonable or deficient performance for counsel to strategically try to mitigate this damage by not reinforcing it through live witnesses. *Cf. Lenz v. Warden of Sussex I State Prison*, 267 Va. 318, 593 S.E.2d 292, 303 (2004) (recognizing that information contained in reports from the various institutions in which petitioner received treatment represents a "two edged sword" that can both assist and harm petitioner).

Moreover, unlike in *Wiggins*, additional investigation by trial counsel in the instant case would not have uncovered new

---

reports in both capital and non-capital criminal cases. Because the mitigation specialist possesses such experience, it was not unreasonable for Kanwisher to be concerned that she would be subject to cross-examination on such issues likely to impact the jury's view of Borchardt's future dangerousness. At the postconviction hearing, the mitigation specialist explained that she could have testified at sentencing as to the impact of Borchardt's "impaired personality problems" and "traumas" on his functioning throughout his life. The mitigation specialist's testimony on these issues would have invited the State to explore alternative explanations for Borchardt's behavior on cross-examination, and how Borchardt's problems would impact his potential for future dangerousness. Kanwisher's concern that the trial court would have permitted the State to cross-examine the mitigation specialist as to Borchardt's potential for future dangerousness was the main reason Kanwisher decided not to call her. He also testified at the postconviction proceeding that Bill Borchardt discussed in his testimony much of what the mitigation specialist would have addressed without the prospects of a damaging cross-examination, because Bill was such a sympathetic witness. Appearing against the backdrop of the mitigation investigation conducted by trial counsel, and the mitigating evidence actually presented by trial counsel, such a decision did not fall below an objective standard of reasonableness amounting to deficient performance.

mitigation evidence "that would have led a reasonably competent attorney to investigate further." *Wiggins,* 539 U.S. at 534, 123 S.Ct. at 2542. In *Wiggins,* trial counsel's mitigation investigation consisted simply of "tracking down" DSS records, and their presentation of mitigating evidence contained no social history testimony, despite the fact that counsel promised the sentencing jury that it would "hear that Kevin Wiggins has had a difficult life." *Id.* at 526, 123 S.Ct. at 2538. Arguing that more mitigation witnesses should have been called and additional mitigation testimony should have been provided, as appellee does, is measurably distinct from trial counsel's failure to investigate social history, which was at issue in *Wiggins.* Distinguishing the failure to conduct a mitigation investigation in *Wiggins* from the failure to put on a more comprehensive mitigation case for the jury, the United States Court of Appeals for the Seventh Circuit explained as follows:

> "[U]nlike *Wiggins,* where [the postconviction] hearing revealed extensive physical and sexual abuse which the court found was unknown to counsel at sentencing but which likely would have been discovered by counsel had they not shirked their investigatory responsibilities, [petitioner] presented very little evidence at the [postconviction] hearing which was materially unknown to counsel. With respect to the 'new' evidence which [petitioner] did introduce at the hearing—regarding the significant impact of [petitioner's] discovery of his adoptive status, the extent of [petitioner's] step-father's alcoholism, and his own use of alcohol—we cannot consider counsel's failure to uncover it deficient performance since these facts were at least referenced and/or generally presented to the jury during the penalty phase by many of the same testifying witnesses."

*Conner v. McBride,* 375 F.3d 643, 663 (7th Cir.2004). *See also, Tucker v. Ozmint,* 350 F.3d 433, 442 (4th Cir.2003) (stating that "[a]lthough counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every

scrap of evidence that could conceivably help their client" (internal quotations and citations omitted)).

The postconviction court erred in holding that Borchardt was denied effective assistance of counsel by not calling Taylor as a mitigation specialist or in not asking her to prepare a more complete social history report.

**B. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in failing to call Dr. Lawrence Donner as an expert witness or failing to either videotape his testimony or call another expert in neuropsychology?**

The Circuit Court held that Borchardt was denied effective assistance of counsel because trial counsel did not call Dr. Donner as a witness and counsel failed to either obtain a videotape deposition of Dr. Donner or to secure another neuropsychologist when counsel learned that Dr. Donner would not be available to testify at the sentencing proceeding.

Dr. Donner is a clinical psychologist, who was hired by the Office of the Public Defender to perform a pre-trial neuropsychological evaluation of Borchardt. In his report that he sent to defense counsel, he stated that Borchardt had health problems, was a substance abuser, suffered from mood disorders and brain dysfunction, and that at the time of the Ohler murders, Borchardt's "capacity to conform his conduct to the requirements of the law was substantially impaired as a result of mental incapacity, mental disorder, and emotional disturbance." He stated that Borchardt would be of no further danger if while imprisoned, he was medicated and closely monitored.

Kanwisher discussed Dr. Donner' s report with him prior to sentencing, and concluded that Dr. Donner's testimony "would have been somewhat problematic for us." When asked by postconviction counsel "[i]sn't it a fact that you didn't call Dr. Donner because you did not have him available for trial" Kanwisher explained as follows:

"The fact of the matter is that Dr. Donner's testimony would have been somewhat problematic for us. What we

were trying to accomplish in the sentencing, realizing that there were a number of, how should I put this, there were a number of potential pitfalls and problems out there, that we were concerned that he would open the door to some of those.

"We were trying to make sure that we didn't do harm in the sentencing as much as we could. W e didn't want to have the sentencing where there was a disproportionate amount of emphasis placed on some of the things that Larry had said and done in the past."

As with Pamela Taylor, Kanwisher did not call Dr. Donner because he was concerned about opening the door to unfavorable information during cross-examination, (such as his diagnosis of antisocial personality disorder), and that he also wanted to avoid having Borchardt examined by the State's expert. His decision was based in part on his past experience in a prior capital case. He explained his decision and concerns as follows:

"The State's expert, potential evaluating expert, was Dr. Lawrence Raifman, who I had cross-examined in the John Thanos case. Now in that case, he testified in the St. Mary's County sentencing. And as I recall, Dr. Raifman testified without benefit of actually interviewing Mr. Thanos.

"Lurking in my mind through these decisions was the potential that Raifman would not only—you know, that the State would request an evaluation, but that Raifman [would] actually show up and do what he did in Thanos, which is essentially make a diagnosis and make findings based purely on a paper record.

"Now we would have attacked it, obviously, because, you know, he didn't have a basis, or a firm basis, not the basis that our experts would have had certainly. But to be fair, I was concerned about Raifman."

Before the postconviction court, Borchardt argued that Dr. Donner could have testified to the existence of two mitigating factors: (1) that the murder was committed while defendant's

capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law was substantially impaired due to emotional disturbance, mental disorder or mental capacity, *see* § 2–303(h)(2)(iv), and (2) that it is unlikely that the defendant will engage in further criminal activity that would be a continuing threat to society. *See* § 2–303(h)(2)(vii). Borchardt also suggested that Kanwisher's failure to call Dr. Donner was not a strategic decision, but rather the result of a scheduling oversight and poor planning.

The State argued that sentencing counsel's decision not to call Dr. Donner was a sound tactical decision, and that such testimony would have opened the door to examination and testimony by a State's expert, particularly Dr. Raifman, whose testimony would have been potentially devastating. The State also argued that calling Dr. Donner would have opened the door to testimony discussing the information contained in State's Exhibits 6, 7, and 8.

The postconviction court found deficient performance and prejudice to Borchardt in counsel's failure to present Dr. Donner's testimony, either live or through videotape, or in the alternative, for failing to secure another neuropsychologist. The court reasoned that Dr. Donner, an extremely reputable and well-qualified expert, "would have thoroughly generated and explained the two statutory mitigators he opines exist in Petitioner's case ... and his opinion would likely have carried great weight and credibility with the jury." The court also concluded that, based upon Dr. Donner's testimony, that there was a scheduling mishap. The court ruled as follows:

"In the instant case, the Court finds it was an objectively unreasonable strategic decision at the least, and a fatal flaw to Petitioner's case at most, for Mr. Kanwisher to fail to put into evidence two reasonably available statutory mitigators at Petitioner's sentencing. It seems obvious that little else could be more persuasive or effective in mitigation than evidence of any one of the factors the Maryland Legislature has specifically enumerated as statutory mitigators. The Court finds it objectively unreasonable for trial counsel to fail to introduce this evidence, regardless of the threat of

Dr. Raifman's testimony or what is contained in State's Exhibits 6, 7 and 8. . . . Trial counsel in Petitioner's case simply backed away from the fight by not introducing the statutory mitigators he had available to him, contrary to his duty as an advocate, particularly an advocate in a capital case with such overwhelming aggravating evidence against his client."

The court also concluded that trial counsel did not conduct a reasonable investigation into his decision not to call Dr. Donner. The court found that Kanwisher had no knowledge regarding Dr. Donner's testimony as to future dangerousness, that he did not consult with Dr. Donner as to the impact of State's Exhibits 6, 7, and 8 on his testimony and that he did not discuss with Dr. Donner the potential impact of any examination or testimony by Dr. Raifman. In addition, the court found that much of the evidence Kanwisher was trying to prevent the jury from hearing came before the jury through the pre-sentence investigation report, and that Kanwisher had to have known that fact. The court found that as a result, "trial counsel's decision was simply not the result of a reasonable investigation of the facts or any investigation at all."

Before this Court, the State argues that the postconviction court failed to credit trial counsel's legitimate strategic decision not to call Dr. Donner, and instead, substituted its own version of trial strategy for that of Kanwisher. Trial counsel did not want to call Dr. Donner to testify as to his findings, the State maintains, because they did not want to provide the State's expert an opportunity to examine Borchardt and to diagnose him with anti-social personality disorder.

Appellee responds that trial counsel's failure to call Dr. Donner was the result of an inadequate investigation, because trial counsel failed to ask Dr. Donner whether he could testify as to future dangerousness, did not consult with Dr. Donner about his opinion regarding the impact of any testimony by Dr. Raifman, and did not ask Dr. Donner if appellee's boasts about other violent conduct would change his conclusion as to the applicable statutory mitigators.

█ As the Supreme Court noted in *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction ... and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." The ineffective assistance prong of *Strickland* is satisfied only where, given the facts known at the time, counsel's "choice was so patently unreasonable that no competent attorney would have made it." *Knight,* 447 F.3d at 15 (internal citations omitted).

█ We hold that defense counsel were not ineffective in failing to call Dr. Donner as a witness, failing to present a videotape of his testimony, or failing to secure another neuropsychologist to testify at sentencing. As we have indicated in § III A, *supra,* the decision whether to call a witness ordinarily is one of trial strategy, and is entitled to deference. The decision was not one that could be said was made to save trial counsel labor, which would not be entitled to deference. *See Pavel,* 261 F.3d at 218–219; *cf. United States v. Gray,* 878 F.2d 702, 712 (3d Cir.1989) (concluding that the performance of trial counsel was deficient where "counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence"). Trial counsel's decision was "strategic" in the sense that it was a question of trial strategy, *i.e.,* which witness to call. It was also "strategic" in the sense that trial counsel declined to call the witness to further a particular trial goal and to serve the client's interest. Within the context of building a case for mitigation, and in an effort to spare their client's life, trial counsel sought to avoid their client's examination by the State's expert whose testimony had proven harmful in a prior case in which Kanwisher represented another capital defendant.

Kanwisher's reasons for not calling Dr. Donner were not so patently unreasonable that no competent attorney would have made the same decision. Defense counsel were aware of Dr. Donner's findings, and they had undertaken a strategy to prevent Borchardt's examination by the State's expert. Dr.

Donner was a medical witness, and as such, defense counsel were not required to consult with him as to the effect of his testimony or his ability to counter any State rebuttal, the potential impact of Dr. Raifman as an expert witness for the State, his opinions regarding State's Exhibits 6, 7, and 8, or whether he could testify to Borchardt's potential for future dangerousness. Although trial counsel could have chosen to discuss these issues with Dr. Donner, decisions on how to counter the State's exhibits, respond to a possible State rebuttal witness, and statutory mitigators to raise at trial are decisions quintessentially to be made by trial counsel.

In developing their mitigation case, defense counsel wanted to avoid Borchardt's examination by the State's expert, State testimony rebutting their experts, and to avoid emphasis by the State to the jury as to Borchardt's future dangerousness. Having made these decisions in putting together their mitigation strategy for sentencing, defense counsel was not required to consult Dr. Donner concerning any of these issues. Even though some of the harmful evidence that counsel wanted to keep out did come into evidence through the presentence investigation report, defense counsel were not unreasonable in attempting to minimize the impact and to limit that evidence to the written report rather than to have the evidence presented again to the jury through a live witness, such as Dr. Raifman, an experienced witness for the State in capital cases, who would have testified in rebuttal to Dr. Donner's testimony.[12] *See Lovitt v. True,* 403 F.3d 171, 180 (4th Cir.2005) (concluding that, where petitioner's attorneys had decided not to emphasize his problem-filled social history, this "strategy of not risking a more determined prosecutorial onslaught with respect to [petitioner's] problematic past was sensible").

---

**12.** Following opening arguments at the sentencing proceeding, the State introduced into evidence the presentence investigation report. The presentence investigation report contained appellee's extensive criminal record, his lackluster motor vehicle record, and a discussion of his institutional and personal histories, among other information, very little of which cast him in a positive or sympathetic light. Although the State introduced the report into evidence, it did not question a live witness concerning its contents.

We agree with the State that it was reasonable for counsel to believe that presentation of evidence harmful to Borchardt, including the contents of the presentence investigation report and State's Exhibits 6, 7, and 8, through direct and cross-examination of witnesses would have been more damaging than beneficial. Trial counsel's failure to challenge the State's evidence in this respect, or consult more extensively with Dr. Donner on these issues, does not make this a *Wiggins*-like case in which counsel did not investigate; rather, this is a case in which counsel investigated and prepared adequately for trial, and then made strategic decisions on how to proceed in light of their investigation and preparation.

The postconviction court also found that the decision not to call Dr. Donner was the result of counsel's scheduling error and not a strategic decision. Approximately one week before trial began, defense counsel argued a motion for postponement of sentencing, on the ground that Dr. Donner was unavailable for the sentencing proceeding. One member of Borchardt's trial team had known about the trial dates since at least November 1999, and apparently, neither of Borchardt's trial attorneys conferred with Dr. Donner about these exact dates, or provided him with the sentencing date.[13] Kanwisher argued that Dr. Donner *might* be needed for sentencing, provided that certain contingencies arose, although he did not disclose those circumstances.[14] He further stated that Dr.

---

13. Dr. Donner had longstanding plans to be out of the country during Borchardt's trial.

14. Kanwisher argued to the trial judge in part as follows:

"And Dr. Donner—and, and we are not, I have been as candid with this Court as I can possibly be about this matter—we're not sure we're gonna call Dr. Donner. But if we do call Dr. Donner, it's gonna be because of very important reasons. And he will become a very important expert witness in our case, but only upon . . . certain contingencies happening in the sentencing that, quite honestly, we don't know if they're going to happen or not. They may or may not, depending on certain evidentiary rulings and other things that are beyond the Defense's ability to control. I cannot stress to you enough that should those particular contingencies occur, that Dr. Donner will be an extremely important expert for us. Should they

Donner's role at sentencing would be different than Dr. Hyde's, and that Dr. Donner was capable of explaining appellee's family history, certain head injuries that he suffered, and that, if necessary, Dr. Donner could explain his personality disorder diagnosis.

Trial counsel's failure to schedule Dr. Donner for sentencing was not ineffective assistance of counsel. From the colloquy among counsel and the court, it is clear that the defense wanted Dr. Donner to be *available* for rebuttal testimony, provided "certain contingencies" arose at trial. At the postconviction proceeding, Kanwisher testified that at the time he argued the motion for postponement, he did not recall if he and Henninger had made a decision whether to call Dr. Donner, and emphasized that counsel had required more time to prepare for trial. He also testified, however, that, in light of trial counsel's strategy to avoid Borchardt's cross-examination by the State's expert and State testimony on appellee's potential for future dangerousness, calling Dr. Donner would have been "problematic." Defense counsel had strategic reasons for not calling Dr. Donner and counsel were not deficient in failing to call him.

**C. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in failing to present evidence relating to future dangerousness?**

The postconviction court found that Borchardt was denied effective assistance of counsel for counsel's failure to present any evidence regarding future dangerousness. As to prejudice, the court concluded that had the omitted evidence been presented to the jury, it would have generated evidence of a statutory mitigator as well as rebuttal to the State's argument, and that it is reasonably probable that at least one juror would have voted to impose a different sentence.

The State argues that in light of the horrendous and brutal nature of the Ohler murders, Borchardt's violent background,

---

not occur, we don't even need to call on him. But we don't know if they are going to happen or not."

his claims to have killed others in the past, his graphic threats to kill others in the future, including his own son, and his statement that he would kill even in jail, the postconviction court was wrong. The State characterizes the evidence as to unlikelihood for future dangerousness as "slim" and that the best any expert could say was that only with a structured environment, constant monitoring and properly prescribed medication would Borchardt not pose a danger to anyone, even in a prison setting.

■ The postconviction court's conclusion that defense counsel were ineffective for failing to challenge the State's evidence as to future dangerousness and that defense counsel offered no strategic reason for failing to do so was erroneous. At the postconviction proceeding, Kanwisher explained repeatedly that trial counsel made a tactical judgment to prevent the State from focusing upon Borchardt's criminal background, bad acts, and repeated threats, in order not to detract from the mitigation case. Instead, trial counsel chose to present a mitigation case predicated largely upon appellee's disturbing family life, brain abnormalities, and lingering doubt as to appellee's principalship, at least with respect to the murder of Mrs. Ohler. Because the record is replete with bad acts committed by Borchardt and other damaging information, and defense counsel made a strategic judgment to avoid an examination of Borchardt by the State's expert, defense counsel's strategy was not unreasonable.[15] *See Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986) (noting that "[a]ny attempt to portray petitioner as a nonviolent man would have opened the door for the State to

---

**15.** The jury could have drawn the conclusion, based on Dr. Hyde's testimony at sentencing regarding the profile of individuals having organic brain impairment, that Borchardt would not be a danger to others while incarcerated. Dr. Hyde testified as follows:

"People with frontal lobe damage and other aspects of organic brain damage do respond, usually, to a combination of medication, and counseling therapy, and abstinence from drugs and alcohol. They respond very well in those cases, with proper administration of medication, are not a danger to themselves or other people in their immediate environment."

rebut with evidence of petitioner's prior convictions"). Borchardt was not denied effective assistance of counsel in this regard.

**D. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective in agreeing to limit the testimony of Dr. Thomas Hyde?**

The postconviction court concluded that Borchardt was denied effective assistance of counsel in agreeing to limit Dr. Hyde's testimony. The court found that counsel were ineffective in failing to allow Dr. Hyde to fully testify to statutory mitigator § 2–303(h)(2)(iv) ("the murder was committed while the capacity of the defendant to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired due to emotional disturbance, mental disorder, or mental incapacity"), his failure to investigate and discover that Dr. Hyde would have testified to the existence of statutory mitigator § 2–303(h)(2)(vii) ("it is unlikely that the defendant will engage in further criminal activity that would be a continuing threat to society"), failing to allow Dr. Hyde to rebut information contained in the presentence investigation report and in Officer Kurtz's testimony by testifying to statutory mitigator § 2–303(h)(2)(vii), failing to investigate Dr. Hyde's opinions about limiting his testimony, and failing to investigate Dr. Hyde's opinions about the ramifications of an antisocial personality disorder diagnosis or State's Exhibits 6, 7, and 8.

Thomas Hyde, M.D., Ph.D., is a board certified neurologist who examined Borchardt for the defense and concluded that he suffered from organic brain impairment. Before the sentencing proceeding began, in anticipation of defense expert witnesses and to rebut defense testimony, the State moved to compel examination of Borchardt by its expert, Dr. Lawrence Raifman. To avoid Dr. Raifman's examination, defense counsel agreed to limit Dr. Hyde's testimony by redacting from his report the statement that organic brain impairment played a significant role in Borchardt's underlying behavior. The trial judge ruled that Dr. Hyde would not be permitted to testify

that Borchardt's organic brain dysfunction was the direct cause of either of the two murders. The trial judge explained further that Dr. Hyde would be permitted to testify that Borchardt has organic brain impairment, and that people having this dysfunction generally possess certain characteristics, but could not opine specifically that Borchardt possesses such traits:

> "It means that you can say . . . Mr. Borchardt has organic brain dysfunction and that people generally with that disorder have the following profile, and it's whatever it is. But you can't say specifically, as to Lawrence Borchardt, this is Mr. Borchardt's profile. You understand?"

Without the limitation on Dr. Hyde's testimony, the State wanted Borchardt examined. It was the State's view that Borchardt did not suffer from a brain disorder but instead it was much more likely that Borchardt was simply antisocial and just a mean, bad person.

Dr. Hyde testified at the sentencing proceeding. He explained that he had performed a comprehensive neurological examination of Borchardt to determine whether there was anything in Borchardt's medical history that could cause brain damage.[16] Dr. Hyde explained to the jury how specific inci-

---

**16.** On direct examination, Dr. Hyde explained the components of a neurological examination, which he performed on Borchardt, as follows:

> "A neurological examination consists of taking a history of the individuals to look for any elements of their history of things that might affect the integrity and function of the person's brain and nervous system. [A neurologist] look[s] for things like substance abuse, head trauma, seizures, infections, and other elements that might cause brain damage.
>
> "The second part, after taking a comprehensive history from an individual, is examining the individual, putting them through a full neurological evaluation, examining what were considered to be sort of the subsystems of the brain, higher intellectual function and cognitive processing, the nerve that controls the face and the spatial sensation—the balance, coordination, strength, reflex, gait."

Dr. Hyde testified that an MRI scan he ordered of Borchardt's brain enabled him to observe atrophy in Borchardt's temporal lobe, the part of the brain responsible for normal learning, memory, and behavioral regulation. He also observed atrophy in the cerebellum, the back of the

dents impacted Borchardt's brain functioning. He testified that Borchardt's mother was kicked in the stomach and knocked down the steps during her pregnancy, that Borchardt was born prematurely requiring forceps extraction, and was delivered with an umbilical cord around his neck. Dr. Hyde explained that Borchardt's long history of bed wetting is often a sign of damage to the frontal lobe of the brain. He explained that brain wave tests conducted on Borchardt during his teen years were abnormal, showing evidence of "developmental brain dysfunction."

Based on his complete neurological evaluation of Borchardt, Dr. Hyde concluded to a reasonable degree of medical certainty that appellee "has evidence of organic brain dysfunction involving many areas of his brain." Dr. Hyde explained to the jury the problems typically affecting individuals suffering from organic brain impairment:

> "Patients with organic brain syndromes involving the frontal lobes, the front part of the brain, do have behavioral abnormalities that are quite profound and govern all aspects of their behavior, in fact, many aspects of their lives. People with frontal lobe damage, which is the front part of the brain right behind the forehead, frequently are impulsive, explosive; they have poor judgment and reasoning; they have poor governance over their emotions, particularly under occasions where they're either sleep-deprived, stressed, intoxicated or withdrawing from drugs or alcohol. So those individuals often behave in what, to an outside observer, would be an irrational or inappropriate fashion, given the circumstances of the provocation or the environmental influences around them."

In response to defense counsel's question regarding treatment options for organic brain impairment, Dr. Hyde testified that individuals with organic brain damage usually respond well to a combination of proper medication, counseling, and absti-

---

brain, which Dr. Hyde explained is important "in some aspects of cognitive function ... most motor functions, and balance, and coordination."

nence from drugs and alcohol. In those cases, Dr. Hyde opined, individuals with organic brain impairment are not a danger to themselves or other people in their immediate environment.

Dr. Hyde's medical report and his written neurological evaluation of Borchardt were also admitted into evidence at sentencing. The report contained information pertaining to Borchardt's medical problems, including a discussion on the possible origins of his organic brain impairment. A brief social history was included, discussing the physical, emotional, and sexual abuse that Borchardt suffered at the hands of his stepfather.

The State argues that, not unlike defense counsel's decision not to call Dr. Donner, the agreement to limit Dr. Hyde's testimony was calculated to avoid opening the door for an examination of Borchardt by the State's expert. In limiting Dr. Hyde's testimony, the State asserts, defense counsel made an informed decision and was not required to consult with Dr. Hyde regarding how he might rebut testimony from the State's expert.

Appellee responds that defense counsel's decision to agree to the limitation on Dr. Hyde's testimony was a decision made after an incomplete investigation. Because defense counsel did not consult with Dr. Hyde concerning his entire range of opinions and credentials, Borchardt continues, their decision to limit Dr. Hyde's testimony was unreasonable.

█ The testimony and report of Dr. Hyde put substantial mitigating evidence before the jury. *See Tennard v. Dretke,* 542 U.S. 274, 288, 124 S.Ct. 2562, 2572, 159 L.Ed.2d 384 (2004) (explaining that evidence of "[i]mpaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately," and thus, it "might serve as a basis for a sentence less than death" (internal quotations and citations omitted)); *Williams,* 529 U.S. at 398, 120 S.Ct. at 1516 (observing that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine . . . the prosecution's death-

eligibility case"). The jury heard that Borchardt suffered from organic brain impairment and that individuals with organic brain injuries are impulsive and explosive, particularly when they are withdrawing from drugs or alcohol. Notwithstanding the agreement between the State and the defense resulting in the trial court precluding Dr. Hyde from testifying to the existence of a nexus between Borchardt's impairment and the Ohler murders, the testimony and report of Dr. Hyde support a reasonable inference that the jury could have drawn that Borchardt's brain impairment caused him to lack the capacity to appreciate the criminality of his actions when he murdered the Ohlers. *See* § 2–303(h)(2)(iv). Dr. Hyde testified that individuals who have organic brain impairment, with proper administration of medication, are not dangerous to themselves or others. Based on this testimony, the jury could have reasonably inferred that Borchardt would no longer be a danger to others if provided proper medical care while incarcerated. *See* § 2–303(h)(2)(vii). Some jury members also found that non-statutory mitigators of abuse and health problems were generated, both of which were discussed in Dr. Hyde's testimony and report.

Defense counsel were not required to consult with Dr. Hyde before concluding that Dr. Hyde's prospective testimony that a nexus existed between their client's brain impairment and the Ohler murders would have opened the door to a State examination of their client, and testimony from the State's expert. Under Maryland law, had Dr. Hyde, as an expert for the defense, testified as to Borchardt's mental state at the time of the murders, the State would have been entitled to examine and evaluate Borchardt. *See Hartless v. State,* 327 Md. 558, 571, 611 A.2d 581, 587 (1992) (concluding that, where "[t]he defendant had given notice of his intention to offer expert testimony concerning his mental state ... the State was entitled to have a reasonable opportunity to properly evaluate and meet that evidence").

Borchardt was not denied effective assistance of counsel because defense counsel failed to consult with Dr. Hyde before agreeing to limit Dr. Hyde's testimony, Borchardt's potential

for future dangerousness, the impact of State's Exhibits 6, 7, 8, and the ramifications of Borchardt's diagnosis of antisocial personality disorder. Neither *Strickland* nor *Wiggins* require defense counsel to consult with experts on every tactical or strategic issue. Defense counsel made an informed, strategic decision, after full investigation of the facts and preparation of the case, in agreeing to limit Dr. Hyde's testimony. Defense counsel had reviewed Dr. Hyde's report and conducted a social history investigation before agreeing to the limitation. Counsel wanted to avoid an examination of Borchardt by the State's doctors.[17] They had a strategic reason for doing so and the agreement to limit the testimony did not amount to ineffective assistance of counsel. No further consultation with Dr. Hyde was required.

**E. Did the Circuit Court err in finding that sentencing counsel was constitutionally ineffective because there was cumulative prejudice as a result of counsel's representation?**

The postconviction court concluded that the cumulative effect of counsel's errors deprived Borchardt of effective assistance of counsel. The court found that Kanwisher "simply neither made reasonable investigations, nor reasonable decisions not to investigate." Because defense counsel's conduct was neither deficient nor resulted in prejudice to appellee, the State maintains, the cumulative effect of the alleged errors is not ineffective assistance of counsel. Even though any of the errors identified by postconviction counsel would be sufficient

---

17. At the postconviction proceeding, Kanwisher explained why he did not want the jury to hear testimony from the State's expert:

"I was more concerned about a State's expert late in the case doing a laundry list of all of Larry's sins, such as they were, and all the statements, such as they were. And I did not want all the good, hopefully good, work that we had done up to that point to be counteracted by that possibility. I thought, in looking at everything, that ... was the worst thing that could happen to us. If that happened ... the jury's eyes would not be on what we were trying to do at that point. They would have been refocused on Larry as the bad person and not on what we were trying to do, which was something else."

to find ineffective assistance of counsel, Borchardt argues, there is also a reasonable probability that but for the *cumulative* effect of defense counsel's decisions, at least one juror would have reached a different conclusion in the balancing of aggravating and mitigating circumstances. We disagree.

Borchardt provides no reason why we should conclude that his claims of ineffective assistance of counsel collectively have any greater force than they have individually. *See Oken II,* 343 Md. at 300, 681 A.2d at 51–52. This is an issue of simple mathematics: "twenty times nothing still equals nothing." *Id.* at 300, 681 A.2d at 52 (citing *Gilliam v. State,* 331 Md. 651, 686, 629 A.2d 685, 703 (1993) (*Gilliam II*)). Accordingly, we conclude that ineffective assistance of counsel did not result from the cumulative effect of the errors alleged by appellee.

The Circuit Court unreasonably applied *Strickland* and *Wiggins* to the allegations in Borchardt's Petition for Postconviction Relief. Simply because counsel's strategy did not succeed, and Borchardt was sentenced to death, it does not follow that defense counsel were ineffective.

## IV.

Borchardt raised the Paternoster issue before the Circuit Court in his amended petition for postconviction relief. The court erred in not deciding the issue.

Before the Circuit Court, Borchardt alleged, on the basis of Dr. Raymond Paternoster's study entitled "An Empirical Analysis of Maryland's Death Sentencing System With Respect to the Influence of Race and Legal Jurisdiction" (hereinafter "Paternoster Study"), that the Maryland death penalty permits the arbitrary and capricious selection of capital defendants in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. Borchardt contended that "the Paternoster Study shows that the race of the victim and geographic location of the crime are frighteningly accurate predictors of whether any given defendant will face the death penalty and will ultimately be sentenced to death." Borchardt maintains that the Paternoster Study shows that the killing of

a white person in Maryland is more likely to result in a death sentence than killing a person of any other race, and that, death-eligible defendants in Baltimore County are more likely to receive a sentence of death than in any other county. Borchardt makes no allegation in his petition that his sentence was influenced specifically by any impermissible racial or geographical factors.

Following an extended discussion between counsel and the court as to whether the postconviction court should rule on the Paternoster issue, the court ultimately decided to hold the matter *sub curia*.[18] At the postconviction hearing, the Circuit Court did not take any testimony or further argument on the Paternoster Study. The court ruled as follows:

"The Court is cognizant that findings of fact are to be made upon all contentions raised by the petitioner in a postconviction proceeding. *Farrell v. Warden of Md. Penitentiary*, 241 Md. 46, 49[, 215 A.2d 218, 220] (1965) (holding that the court should make findings of fact as to every claim raised); *Prevatte v. Director, Patuxent Institution*, 5 Md.App. 406, 414[, 248 A.2d 170, 175–76] (1968) (holding that it is incumbent upon the judge who conducts the postconviction hearing to make findings of fact upon all contentions raised by the petitioner). However, at the postconviction hearing it was agreed that the Court would reserve ruling on this particular issue until an opinion was rendered on all other issues, particularly on the allegation of ineffective assistance of counsel at sentencing. *Accordingly, the Court invites Petitioner to request a hearing on the Paternoster issue if, after receiving this Opinion and Order, he still chooses to pursue the matter.*"

18. The State argued to the court that Borchardt did not have standing to raise the Paternoster issue at that time because, if the court granted him relief, he would not be under a sentence of death. The State was wrong. The hearing judge made it clear that she was prepared to rule on the Paternoster issue, stating "that I would go ahead and decide this issue and then we will see where it goes from there." The court should have ruled on all issues raised in the petition.

Thereafter, postconviction counsel, in a pleading captioned "Defendant's Notice Regarding Paternoster Issue," asked the court *not* to rule on the Paternoster issue and instead to hold the matter *sub curia* pending a resolution of his appeal. He stated as follows:

"Petitioner requests that the second part of his post conviction hearing dealing with the Paternoster issue be held in abeyance and conducted only if (1) the State seeks leave to appeal, (2) leave is granted and (3) this Court's May 26, 2005 decision granting Petitioner a new sentencing is reversed."

The Circuit Court then ordered "that the Paternoster issue be held in abeyance and conducted only if the State seeks leave to appeal, leave is granted, and the upper court reverses this Court's May 26, 2005 decision granting Defendant a new sentencing."

The postconviction court erred in not ruling on the Paternoster issue. The postconviction judge's decision to hold the Paternoster issue in abeyance, pending our action on its disposition of the ineffective assistance contentions matter, was contrary to Md. Rule 4–407 and the precedents of this Court. As a matter of law, the postconviction court was required to rule globally and concurrently on each allegation raised by Borchardt's Petition for Postconviction Relief. The trial judge was well aware that the court was *required* to make findings as to every allegation raised by a petition for postconviction relief. *See Wilson v. State*, 284 Md. 664, 675, 399 A.2d 256, 262 (1979); *Farrell*, 241 Md. at 49, 215 A.2d at 220; *Duff v. Warden*, 234 Md. 646, 648, 200 A.2d 78, 80 (1964). *See also Daniels v. Warden*, 222 Md. 606, 607, 158 A.2d 763 (1960) (holding that "[o]rdinarily, unless it certainly appears that an asserted ground for post conviction relief has been either abandoned or a finding thereon waived by the petitioner or his counsel, the failure of the lower court to consider *all* of the contentions of a petitioner would require a remand for a finding on all questions raised"). The purpose of the requirement of a ruling with respect to each ground raised in the postconviction petition is to provide a comprehensive state-court review of a defendant's claims and to eliminate delay and

multiple postconviction hearings and federal hearings. *See Fudge v. State,* 354 Ark. 148, 120 S.W.3d 600 (2003). Md. Rule 4–407(a) implements that statutory requirement that the hearing judge rule on each ground, and states as follows:

"(a) **Statement.** The judge shall prepare and file or dictate into the record a statement setting forth separately each ground upon which the petition is based, the federal and state rights involved, *the court's ruling with respect to each ground,* and the reasons for the action taken thereon. If dictated into the record, the statement shall b e promptly transcribed."

(Emphasis added).

In *Gilliam II,* 331 Md. 651, 629 A.2d 685, a postconviction proceeding in a capital case, Gilliam contended on appeal that the postconviction court "failed in its duty to set forth, with precision, each contention of the Petitioner, a ruling thereon and the reasons therefor." Gilliam complained before this Court that the trial judge did not rule on his contention that his appellate counsel was inadequate in that, in the first appeal, counsel did not raise the issue that Gilliam did not knowingly and intelligently waive a jury trial because there was no showing that he had been told he had the right to have a jury decide whether he was not criminally responsible. The postconviction court made no finding on this contention. We held that "[i]t is obvious that the contention has no merit." *Id.* at 693, 629 A.2d at 706. Rather than remand the matter for further proceedings, we concluded that there was no reason to remand for additional rulings and decided all of the issues without remanding for additional rulings.

▆▆▆▆▆▆ Likewise, we shall, and are able to, address Borchardt's apparent Paternoster issue on the record before us and conclude that it has no merit. The issue is controlled by our opinion in *Evans v. State,* 396 Md. 256, 914 A.2d 25 (2006). In *Evans,* in an extensive discussion of the Paternoster Study, we rejected the attack upon the Maryland Death Penalty Statute based upon that study. We accepted the reasoning in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d

262 (1987), "concerning the failure of general statistics to establish a statewide Equal Protection or Cruel and Unusual Punishment violation and instead require a defendant to assert some specific discriminatory intent in their case." *Evans*, 396 Md. at 325, 914 A.2d at 66, 2006 WL 3716363 at *33. Borchardt makes *no* claim whatsoever that there is any specific evidence of discrimination in his case.[19] The Paternoster Study does not establish that the Maryland Death Penalty Statute violates the Eighth or Fourteenth Amendment to the United States Constitution or the Maryland Declaration of Rights.

*JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.*

BELL, C.J., dissents and files opinion in which BATTAGLIA and GREENE, JJ., join in part.

---

**19.** Borchardt is white and his victims were white. In his petition, he does not allege that the State discriminated against him in any way; other than presenting a facial attack on the statute based on the Paternoster Study, Borchardt's geographically-based argument can cleave only to the statistical observation in Dr. Paternoster's 2004 supplement to the original 2003 report where it is noted that the State's Attorney in Baltimore County (where Borchardt's crimes were committed) sought the death penalty in 99 of 152 death-eligible cases (65%), the highest rate in the State. *See Evans*, 396 Md. at 310–11, 914 A.2d at 57, 2006 WL 3716363 at *25. From the data he analyzed, Dr. Paternoster concluded that "the probability that the Baltimore County state's attorney will file a notification to seek death in a white offender case is .70 while the probability for a black offender case is .60" and that "[t]his shows quite clearly that there is a greater tendency for the Baltimore County state's attorney to file a notification to seek a death sentence in a black offender case rather than one involving a white offender." *See Evans*, 396 Md. at 313, 914 A.2d at 58, 2006 WL 3716363 at *27. Borchardt's situation in that regard is less favorable than is Evans'.

In *Evans*, we embraced the reasoning of *McCleskey*, that mere statistical studies showing apparent discrepancies in sentencing "are an inevitable part of our criminal justice system," largely explainable by the fact that decisions whether to prosecute and what to charge "necessarily are individualized and involve infinite factual variations," but do not rise to the level of systemic defects. *See Evans*, 396 Md. at 318–19, 914 A.2d at 62, 2006 WL 3716363 at * 29. Borchardt's Paternoster contentions then fare no better than did Evans' contentions.

BELL, Chief Judge, dissenting.

## I.

The majority concludes that *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003) stands for the singular proposition that the inquiry into the deficient performance of counsel prong of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) means simply a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" 396 Md. 586, 603, 914 A.2d 1126, 1135. It is through this lens that the majority views the defense strategy employed by Borchardt's trial counsel and concludes that it did not constitute ineffective assistance of counsel.

I believe it to be clear from my discussion in *Evans v. State*, 396 Md. 256, 389–90, 914 A.2d 25, 104 (2006) (Bell, C.J., dissenting), that *Wiggins* and, as well, *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), stand for more than just the consideration of an attorney's challenged conduct from that attorney's perspective and under the circumstances existing at the time. On the contrary, I believe, and stated as much in *Evans*, that these cases do not countenance, much less endorse, "presenting a mitigation case without an adequate and full investigation, or without considering how what is presented can be used against the defendant and whether it may have the opposite effect, very well may aggravate, rather than mitigate, the defendant's case," *Evans*, 396 Md. at 389, 914 A.2d at 104 (Bell, C.J., dissenting), irrespective of whose perspective is invoked.

In *Wiggins*, the Supreme Court held that trial counsel's failure to investigate the defendant's life history or family background and present it as part of the defendant's mitigation case constituted ineffective assistance of counsel. In particular, it concluded that trial counsel's decision not to expand their investigation beyond the PSI and DSS records, records of which they were already aware, "fell short of the professional standards that prevailed in Maryland...." 539 U.S. at 524–525, 123 S.Ct. at 2536–2537, 156 L.Ed.2d at 486–

487. In addition, this Court was reminded that the reasonableness of an attorney's investigation cannot be determined by assessing, alone, what the attorney knows; a reviewing court needs also to consider and determine, the Court explained, whether the known information would lead a reasonable attorney to investigate further. In short, the Court was quite clear that, "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Id.* at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488. This Court was criticized for having objectively unreasonably applied the *Strickland* precepts.

*Rompilla* is to like effect. It makes the point that, in preparation of a mitigation case, simply interviewing the defendant and his family is an insufficient investigation, 545 U.S. at 381–82, 125 S.Ct. at 2462–2463, 162 L.Ed.2d at 372, that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id.* at 377, 125 S.Ct. at 2460, 162 L.Ed.2d at 369. The Supreme Court held, in that case, that trial counsel's failure to examine a court file on Rompilla's prior rape and assault conviction, a crime similar to the one with which he was charged, constituted ineffective assistance of counsel. 545 U.S. at 385–386, 125 S.Ct. at 2465–2466, 162 L.Ed.2d at 375.

In sum, when these cases are considered together, when their combined holdings are given effect, they reflect that a reviewing court must not only ask whether the attorney's actions, viewed from his perspective, were reasonable under the circumstances, but also must consider whether a reasonable lawyer, under similar circumstances, would have done more.

## A.

In preparing for the presentation of the mitigation case he planned to, and ultimately did, offer at Borchardt's sentencing

proceeding, defense counsel hired a mitigation specialist. Despite there being funds available to do so, however, after receiving from the specialist a letter containing two paragraphs of "substantive mitigating information," he did not ask her to prepare a "comprehensive psychological history in report form." Nor was the mitigation specialist called as a witness at the sentencing proceeding or her letter containing her summary of the mitigation factors she found moved into evidence. In addition, although they were damaging to the mitigation case they presented, trial counsel did not question, or challenge in any way, the validity or accuracy of the State's exhibits pertaining to, and highlighting, Borchardt's prior bad acts, namely, prior convictions, threats that he made, and other admitted murders.

What her "comprehensive psychological history in report form" would have looked like and contained was revealed at the post-conviction hearing. It was a twenty-six (26) page report, "based on essentially the same information available to her at the time of sentencing"—information that the sentencing jury never had the opportunity to view—, which was admitted into evidence in those proceedings. In the report, the mitigation specialist reached professional opinions regarding Borchardt's past experiences with sexual, physical, and emotional abuse, early adversities, his low intelligence level, the lack of protective support systems, his substance abuse problems, and his struggle with chronic pain. From these opinions, she concluded that:

"1. Mr. Borchardt's early formative experiences of violence, physical and sexual abuse, and emotional denigration thwarted his emotional development, limiting the internal resources available to him to later thrive and deal with his life constructively.

"2. These adversities undermined Mr. Borchardt's self-worth and ability to get along with others and contributed to severe impairment in all major aspects of his life functioning.

"3. Mr. Borchardt suffered from below average intellectual functioning, further compromising his ability to cope with his circumstances.

"4. Mr. Borchardt had no alternative protective support systems, inside or outside the home, to help buffer the violence and chaos in his life.

"5. Mr. Borchardt was at a significant risk, both biologically and socially, for developing substance abuse problems, and from an early age, came to adopt chemical dependence as a way to block out his earlier traumas and to cope with his day-to-day life.

"6. In addition, as an adult, Mr. Borchardt struggled with significant chronic pain, which served to exacerbate his earlier problems."

The report also covered areas not addressed by other witnesses at sentencing; it detailed various specific examples of sexual, physical, and emotional abuse that Borchardt witnessed and experienced as a child and opined as to their effect on Borchardt's development. For example, she opined that early experiences of sexual victimization "served to undermine [Borchardt's] ability to form trusting relationships with others—most especially fostering a foundation of mistrust of authority figures."

The mitigation specialist also testified at the post conviction proceedings; indeed, hers was the bulk of the post conviction case. Her testimony at the post-conviction hearing revealed that, had she been called at the sentencing hearing, she would have put Bill Borchardt, Borchardt's brother, and his testimony in context. She could have, and would have, provided an explanation for the differences in the brothers' development.

The majority rationalizes trial counsel's decisions regarding the mitigation specialist and the mitigation case it produced. The majority draws a distinction between the knowledge base of counsel in the case sub *judice* and counsel in *Wiggins,* maintaining that counsel in this case, unlike the *Wiggins* counsel, knew of "several sources of mitigating evidence," and "had knowledge of [Borchardt's] family life, and the frequent

obstacles [he] encountered in his life." It also is persuaded that counsel's "strategy," which was "intended to prevent any social history witness from facing cross-examination damaging to Borchardt's mitigation specialist," was an "exercise of reasonable professional judgment." 396 Md. at 614, 914 A.2d at 1142. The majority concludes:

"When counsel decided not to call Taylor as a witness at sentencing, on basis of the summary of her findings [trial counsel] had reviewed prior to trial, they knew Taylor was prepared to opine that Borchardt's life and lack of intellectual capacity inhibited his development, and that Borchardt's abuse and heroin dependency contributed to the Ohler murders[1]. If trial counsel had called Taylor at sentencing, the State would have had the opportunity to cross-examine her on foundation of her opinions, the sources of her research, and other factors possibly contributing to Borchardt's 'life-functioning' and his murder of the Ohlers. Considering trial counsel's concerns regarding cross-examination of the mitigation specialist in light of the mitigation case they did put on at trial, trial counsel made a strategic choice not to call the mitigation specialist at sentencing. Defense counsel's strategy and concerns were reasonable. Even though some of the harmful evidence came before the jury from other sources, it was not unreasonable or deficient performance for counsel to strategically try to mitigate this damage by not reinforcing it through live witnesses."

396 Md. at 616–17, 914 A.2d at 1143–44.

The post conviction court found that many of the topics on which Borchardt's trial counsel did not want the mitigation specialist to be cross-examined by the State were already ripe for attack, evidence of some of these topics having been admitted into evidence through other, prior witnesses. The court further found that trial counsel did not investigate fully the available mitigating evidence that the mitigation specialist had and/or would have amassed. Indeed, even trial counsel admitted, after reviewing the finished report, that it was "impressive," and "he would have 'certainly consider[ed]' putting it into evidence if he had the report at sentencing."

It is not at all clear on what basis the majority has chosen to disregard, or, at the very least, not to defer to the factual findings made by the post conviction court, that trial counsel failed fully to investigate the mitigation case and evidence. The law in this State is clear. *See, e.g., In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691, 693 (1997) (holding that in considering evidence presented at a suppression hearing, the Court of Appeals extends great deference to the fact-finding of the suppression hearing court with respect to credibility of witnesses and first-level facts, and when the evidence is conflicting, accepts facts as found by hearing court unless those findings are clearly erroneous). Indeed, in *Wiggins,* the Supreme Court of the United States deferred to the factual findings of the habeas court. 539 U.S. at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488(finding this Court's application of *Strickland* objectively unreasonable).

*Wiggins* and *Rompilla* are clear, as well, an attorney performs deficiently when he or she undertakes representation and, during the course of that representation, without fully, or at least adequately, *Rompilla,* 545 U.S. at 389, 125 S.Ct. at 2467, 162 L.Ed.2d at 376–377, investigating the matter and without fully, or at least adequately, *Wiggins,* 539 U.S. at 534, 123 S.Ct. at 2541, 156 L.Ed.2d at 492, considering the effect or consequence of the decision, decides to, and does, present a particular defense. That the attorney has *some* information about the defense and has knowledge of some of the evidence bearing on it, while relevant, is by no means dispositive. As the Supreme Court made clear in *Strickland v. Washington,* 466 U.S. 668, 690–691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984), "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Though stated differently, the Court made the same point in *Wiggins,* "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." 539 U.S. at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488. These observations confirm

and underscore what has become a truism, "a little knowledge is a dangerous thing." [1]

If the omissions in *Wiggins* and *Rompilla* were deficient performance by the attorneys there involved, requiring the reversal of the sentences and a new sentencing proceeding, the omission in this case can be no less and requires the same result. Armed only with two paragraphs reporting the mitigation specialist's preliminary conclusions with regard to mitigating factors available, and favorable, to Borchardt, and even though he intended to make, and did, in fact, present, a mitigation case, counsel made the decision not to call the mitigation specialist as a witness at sentencing. As a result, because that decision rendered it no longer necessary to do so, no further investigation was required to be made by the mitigation specialist and none was conducted.

To be sure, counsel made the decision not to call the mitigation specialist while aware of the mitigation specialist's summary of her findings, but its basis was counsel's desire to avoid the cross-examination of the specialist by the State. In particular, counsel did not want the specialist cross-examined as to the foundation for her opinion, the sources of her research and "other factors" relevant to Borchardt's "life-functioning," and, thus, "responsibility" for the murders, of which he had been convicted.

Cross-examination is a critical and well settled part of the American judicial system. It has been described as a valuable tool in the search for truth. *See State v. Cox*, 298 Md. 173, 178, 468 A.2d 319, 321 (1983) (noting that "the trial of any case is a search for the truth. The strength of each side of an issue rests upon the believability of the evidence offered as proof. This evidence unfolds, in large measure, as testimony of the witnesses is produced at trial. The tool available to each side

---

1. As stated by Alexander Pope (1688–1744):
 "A little learning is a dangerous thing; drink deep, or taste not the Pierian spring: there shallow draughts intoxicate the brain, and drinking largely sobers us again."
 An Essay on Criticism, 1709.

to test the believability of the testimony is cross-examination"). It is a tool that is available to all litigants, not just to one side to the exclusion of the other, although, to be sure, some practitioners are better cross-examiners than others. Thus, every witness called to testify at trial, be it a civil or a criminal trial, is subject to cross-examination. Nevertheless, the utility of the cross-examination is in the search for truth, not simply as a tool. Because it is a tool available for use by all and it applies to all witness, something more than the desire to avoid cross-examination, however earnest and no matter how sincere, must be shown to render the decision to forgo favorable evidence to achieve it, a "reasonable" choice.

With respect, without a good deal more than this record reveals, I fail to see how the decision in this case was any more "strategic" or reasonable than the decision in *Wiggins*. There is nothing in this record to suggest that the mitigation specialist would not have been a good witness, able to hold up under cross-examination. And, of course, her report had yet to be completed and the completed report considered in light of the overall defense. In the absence of some objectively observable or perceived weakness in the witness, her presentation as a witness, for example, or in the case the witness prepared, the decision not to call the mitigation specialist, made in advance of the completion of her report, simply is not a reasonable "strategic choice." Because the mitigation specialist never completed her report before the sentencing proceeding, indeed, was not allowed to do so, by "strategic" choice, counsel could not have known what the report precisely would conclude and, therefore, the quality and meritoriousness of those conclusions. Nor did counsel have an opportunity to test the conclusions in conferences with the specialist and in comparison to other data. Without the benefit of such information and consultation, counsel had no basis on which to conclude that, because her conclusions were not sufficiently supported by the research and the report, cross-examination of the mitigation specialist would be detrimental to Borchardt's case or that she would not have been able to withstand it. It is of interest that, having reviewed the completed report, counsel conceded its impressiveness and that he seri-

ously would have considered using it at sentencing, had it existed.

Counsel's decision was hasty, to say the least. It also was deficient performance.

## B.

*Wiggins* and *Rompilla* also guide the resolution of the issues Borchardt raises with regard to his trial counsel's decision not to call Dr. Lawrence Donner as an expert witness at the sentencing proceeding and to limit the testimony of another expert witness, Dr. Thomas Hyde, whom he did call. In each case, the decision constituted deficient performance, it having been made without an adequate foundation or after a reasonable investigation and without regard to the consequences or effect on the defendant.

Dr. Donner, a neuropsychologist, was retained by the defense, as an expert witness. He was expected to opine that Borchardt suffered from a substantial mental impairment and that he would not be a future danger and to testify to that effect at the sentencing proceeding. He was not called as a witness and, when it became clear that Dr. Donner was not available to testify at the time set for the sentencing proceeding,[2] trial counsel did not secure a substitute expert to testify in his stead. The decision not to call Dr. Donner, as was, presumably, the decision not to seek a replacement, was driven by trial counsel's desire, and attempt, "to avoid their client's examination by the State's expert whose testimony had proven harmful in a prior case in which [trial counsel] represented another capital defendant." 396 Md. at 623, 914 A.2d

---

2. The post conviction court found that Dr. Donner did not testify, not because of a strategic decision by trial counsel, but rather because of "a scheduling oversight and lack of proper planning" by trial counsel. That finding is supported by the record and, thus, itself requires the relief sought. Perhaps it is because trial counsel did not make any attempt to videotape Dr. Donner's testimony or hire another expert to take his place when it became clear that Dr. Donner would be out of the country during the sentencing proceeding that the majority accepts the argument that counsel's not calling Dr. Donner was a matter of strategy.

at 1148. It was also made without discussing with Dr. Donner the concerns counsel had with regard to the State's expert and whether they could, or would, be met or addressed by his testimony. Under the circumstances, Borchardt argues that the decision was made without an adequate investigation and, therefore, he received ineffective assistance of counsel.

The majority rejects the argument, reasoning:

"We hold that counsel were not ineffective in failing to call Dr. Donner as a witness, failing to present a videotape of his testimony, or failing to secure another neuropsychologist to testify at sentencing .... the decision whether to call a witness ordinarily is one of trial strategy, and is entitled to deference.... Within the context of building a case for mitigation, and in effort to spare their client's life, trial counsel sought to avoid their client's examination by the State's expert whose testimony had proven harmful in a prior case in which [trial counsel] represented another capital defendant.

"[Trial counsel's] reasons for not calling Dr. Donner were not so patently unreasonable that no competent attorney would have made the same decision. Defense counsel were aware of Dr. Donner's findings, and they had undertaken a strategy to prevent Borchardt's examination by the State's expert. Dr. Donner was a medical witness, and as such, defense counsel were not required to consult with him as to the effect of his testimony or his ability to counter any State rebuttal, the potential impact of Dr. Raifman as an expert witness for the State, his opinions regarding State's Exhibits 6, 7, and 8, or whether he could testify to Borchardt's potential for future dangerousness. Although trial counsel could have chosen to discuss these issues with Dr. Donner, decisions on how to counter the State's exhibits, respond to a possible State rebuttal witness, and statutory mitigators to raise at trial are decisions quintessentially to be made by trial counsel."

396 Md. at 623–24, 914 A.2d at 1147–48.

I do not agree. The only basis for the decision not to call Dr. Donner that I can discern was counsel's desire to avoid

Borchardt being examined by Dr. Raifman, the State's expert. The reason for wanting to avoid such an examination was the fear, based on counsel's prior experience in another capital case, in which counsel's client was examined by Dr. Raifman, that the examination and his subsequent testimony regarding it and the findings he made, would, as it did in the prior case, prove harmful to Borchardt and to the defense case. That fear obviously was real and sincere, as it was evident and, indeed, reflected, in the Donner decision. It is significant, however, that the prior experience that counsel had with the State's expert involved a different defendant and, I would submit, different facts. To be sure, examination of one's client by an expert retained by one's opponent is fraught with peril; it may, perhaps often, uncover information or issues unfavorable to the client and to the case sought to be presented, and that expert's testimony at trial or other court proceeding, may be, as it is intended to be, harmful to the client's case. That, however, is a risk that always exists. How much of a risk there is, is another matter, one that generally is only a matter of speculation. Whether the risk will be realized is by no means certain, being dependent on a number of factors, including the facts of the case, the preparation, the science, etc. Avoiding a risk that is only speculative does not a strategic choice make. And certainly it cannot be the basis for one, a "strategic choice."

The Dr. Donner decision was based on no more than speculation. Every defendant is different and so too are the facts of every case. It cannot be supposed reasonably or logically that, simply because an expert was able, by his or her testimony, to "hurt" one case defended by an attorney, that, in a totally different case, with a different defendant and different facts, he or she necessarily will be able to duplicate that feat. That requires a fact-based analysis. Critical to that analysis, indeed essential to determining the impact on one's case of the examination of a party and testimony with respect to that examination by an expert witness for the other party, is an assessment of one's own case and the quality of the expert retained to support it, his or her ability to defend his or

her expert opinion and position and his or her ability to address and explain contrary views, in particular, those offered by the other party. A decision to forego the use of mitigation evidence favorable to the defendant without, at a minimum, undertaking such an analysis is simply not an informed or reasoned one, being, at best, careless and, at worst, a dereliction of duty, a failure to fully investigate or inform oneself before acting. In either case, the effect, the result, is ineffective assistance of counsel.

The majority points out, correctly, I agree, that defense counsel is under no obligation to consult with an expert witness concerning the defense counter to the State's exhibits, how best to respond to the State's evidence or a possible State rebuttal witness, and what statutory mitigators to raise at trial. That, however, is not the issue. The issue, rather, is whether the critical decision to forego the use of favorable evidence was an informed one. Presumably, of course, trial counsel could have received information supportive of the Dr. Donner decision from a source other than his expert and, had he done so, the decision would not have been ineffective assistance of counsel. On this record, there simply is no basis for concluding that trial counsel made any pertinent fact-based analysis, not to mention one based on information obtained from a source other than his expert. Thus, the only way in which he could have proceeded to make the Dr. Donner decision with full, or at the least, adequate, information was by discussing the issues and his concerns with Dr. Donner and exploring with him what was probable, based on Dr. Donner's examination and considering worst case scenarios, should Borchardt be examined by Dr. Raifman. It is counsel's failure to obtain, or even seek, pertinent information before deciding to forego the use of ostensibly favorable evidence, which constitutes ineffective assistance of counsel. *Wiggins* and *Rompilla* dictate that an attorney must fully explore the mitigation paths that exist before making a decision; where he or she has not otherwise conducted a full or adequate investigation using other sources, he or she, before abandoning potentially helpful testimony must, at the very least, talk to his or her

expert witnesses to determine what potential pitfalls there are and whether they can be overcome.

Dr. Hyde, in preparation for the sentencing proceeding, conducted a series of clinical examinations of Borchardt, including a physical exam, a mental exam, a cranial nerve exam, a motor skills exam, a sensory system exam, and an MRI. He concluded that Borchardt

"suffers from organic brain damage within the cortex, the thinking portion of the brain, which results in impulsive behavior, poor decision making, and the inability to think through the consequences of actions, and that this brain damage contributed to [his] actions in killing the Ohlers; that with abstinence from drugs and alcohol, proper nutrition, proper psychiatric medication, counseling, and a structured environment, it is unlikely that [he] will pose a danger to others; that [he] does not suffer from antisocial personality disorder; that [he] has suffered a significant amount of brain damage which affects his ability to control his actions, explaining, in part, the sexual offense [he] committed in the past; and that [he] is a polysubstance abuser, which also causes brain damage and difficulty in the consideration of consequences to actions."

Trial counsel agreed to limit Dr. Hyde's testimony as to the nexus between Borchardt's brain damage and the crimes of which he had been convicted. He did so without discussing with Dr. Hyde what his testimony would be and of what probable effect not inquiring into nexus would have, out of a non-specific fear of a damaging State's examination of Borchardt. In fact, Dr. Hyde was not informed, prior to sentencing, that his testimony would be limited.

In regard to the limitation of Dr. Hyde's testimony, the majority notes:

"Borchardt was not denied effective assistance of counsel because defense counsel failed to consult with Dr. Hyde before agreeing to limit Dr. Hyde's testimony, Borchardt's potential for future dangerousness, the impact of State's Exhibits 6, 7, 8, and the ramifications of Borchardt's diagno-

sis of antisocial personality disorder. Neither *Strickland* nor *Wiggins* require defense counsel to consult with experts on every tactical or strategic issue. Defense counsel made an informed, strategic decision, after full investigation of the facts and preparation of the case, in agreeing to limit Dr. Hyde's testimony. Defense counsel had reviewed Dr. Hyde's report and conducted a social history investigation before agreeing to the limitation. Counsel wanted to avoid an examination of Borchardt by the State's doctors.[ ] They had a strategic reason for doing so and the agreement to limit the testimony did not amount to ineffective assistance of counsel. No further consultation with Dr. Hyde was required."

396 Md. at 632–33, 914 A.2d at 1153–54.

The same analysis required in the case of Dr. Donner applies with equal force here. I add what I said in *Evans*. The reasonableness of an attorney's investigation can not be determined by assessing, alone, what the attorney knows; a reviewing court needs also to consider, and determine, whether the known information would lead a reasonable attorney to investigate further, and that "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Wiggins* at 527, 123 S.Ct. at 2538, 156 L.Ed.2d at 488.

The majority gives deference to the decisions made by Borchardt's counsel because "the question of whether to call a witness is a question of trial strategy entrusted ordinarily to counsel; therefore, we afford defense counsel's decision not to call the mitigation specialist great deference." 396 Md. at 614, 914 A.2d at 1142, *citing Knight v. Spencer*, 447 F.3d 6, 16–17 (1st Cir.2006); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998); *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989); *Trapnell v. United States*, 725 F.2d 149, 155–56 (2d Cir.1983); *United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir.1974); *In re Davis*, 152 Wash.2d 647, 101 P.3d 1, 52 (2004). The majority does note, however, that the decision not to call a witness must be grounded in a strategy that advances the client's interests, *Pavel v. Hollins*,

261 F.3d 210, 218–19 (2d Cir.2001), and that if an attorney decides not to call a witness without regard for the client's interests, that decision is not a strategic choice entitled to deference, *id.* at 219. In each case, trial counsel did not make a fully informed decision.

## II.

While the majority appropriately recognizes that the Circuit Court erred in not deciding the Paternoster Issue as presented by Borchardt in his amended petition for postconviction relief, 396 Md. at 634, 914 A.2d at 1154, it incorrectly holds that "Borchardt's apparent Paternoster issue . . . has no merit," 396 Md. at 637, 914 A.2d at 1156, relying on the reasoning of *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) that, in order to establish a statewide Equal Protection or Cruel and Unusual Punishment violation, a defendant must "assert some specific discriminatory intent in their case." The majority goes on to conclude that "Borchardt makes *no* claim whatsoever that there is any specific evidence of discrimination in his case." 396 Md. at 638, 914 A.2d at 1156.

I believe that my discussion of the Paternoster study in *Evans,* 396 Md. 256, 396–400, 914 A.2d 25, 108–10 (2006) (dissenting, Bell, C.J.) applies with equal force here, that "*United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), mandates that [the defendant] be entitled to discovery in order appropriately and effectively to present his selective prosecution claims." *Evans,* 396 Md. at 397, 914 A.2d at 108 (dissenting, Bell, C.J.).

In *Armstrong,* the Supreme Court considered the showing necessary for a defendant to be entitled to discovery on a selective prosecution claim. 517 U.S. at 458, 116 S.Ct. at 1483, 134 L.Ed.2d at 694. Armstrong claimed that the government had declined to prosecute defendants of other races that were similarly situated. 517 U.S. at 458, 116 S.Ct. at 1483, 134 L.Ed.2d at 694.

In a decision instructing the government to produce information regarding the criteria for deciding when to prosecute cases in which it had charged both firearms and cocaine offenses, the Supreme Court held:

"The requirements for a selective-prosecution claim draw on 'ordinary equal protection standards.' ... The claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' ... To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."

517 U.S. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699 (citations omitted).

Moreover,

"Having reviewed the requirements to prove a selective-prosecution claim, we turn to the showing necessary to obtain discovery in support of such a claim. If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."

517 U.S. at 468, 116 S.Ct. at 1488, 134 L.Ed.2d at 701.

Discussing that correspondingly rigorous standard for discovery, the Supreme Court remarked:

"The Court of Appeals held that a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are similarly situated to the defendant.... We think it was mistaken in this view.

\* \* \* \*

"In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable

task to prove that persons of other races were being treated differently than respondents. For instance, respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court. We think the required threshold-a credible showing of different treatment of similarly situated persons-adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution."

517 U.S. at 469–470, 116 S.Ct. at 1488–1489, 134 L.Ed.2d at 701–702 (citations omitted). Therefore, under *Armstrong,* a credible showing of different treatment of similarly situated persons will justify discovery by the defendant.

It does not matter that, as the majority points out, "Borchardt is white and his victims were white," "[Borchardt] does not allege that the State discriminated against him in any way; other than presenting a facial attack on the [death penalty] statute based on the Paternoster Study," and "Borchardt's situation ... is less favorable than is Evans'," 396 Md. at 638, n. 19, 914 A.2d at 1156, n. 19. The simple fact is that Borchardt is asserting a claim that he was selectively prosecuted in violation of his constitutional rights, and that this affected his conviction.

Additionally, and more important, an adequate presentation of specific evidence of discrimination by the defendant cannot occur without adequate discovery from the State. It follows, then, that until an adequate presentation of specific evidence of discrimination is heard, the merits cannot be decided; to do so would be premature. The Paternoster study illustrates that death-eligible defendants in Baltimore County are more likely to receive a sentence of death than in any other county. This study alone satisfies the *Armstrong* standard, justifying further discovery.

Judge BATTAGLIA joins in the views expressed in Part I of this opinion and Judge GREENE joins in Part II.